HAMPARTZOON MINASIAN *vs.* ROBERT L. OSBORNE & others.
MINAS H. MINASIAN *vs.* SAME.

Suffolk.   March 29, 1911. — November 29, 1911.

Present: RUGG, C. J., MORTON, HAMMOND, LORING, BRALEY, &
SHELDON, JJ.

*Strike. Equity Jurisdiction,* To enjoin unlawful strike. *Labor.*

The lasters employed in a shoe factory, where work is paid for by the piece and there is not sufficient work to keep all of the lasters employed all of the time, lawfully may maintain a strike undertaken in good faith to prevent the proprietor of the factory from permitting a laster in his employ to employ and pay a helper, for whose work the laster is paid by the proprietor in addition to being paid for his own work, the purpose of the strike being to cause the abolition of the system of such an employment of helpers in that factory because it resulted in an unequal distribution of the work of lasting at times when there was not enough work for all the lasters and thus affected their wages.

TWO BILLS IN EQUITY, filed on December 23, 1910, the plaintiff in the first case being the father of the plaintiff in the second case, and the defendants in both cases being representatives and members of the Lasters' Union Local No. 1, an unincorporated association, alleging the facts which are stated in the opinion, and praying for an injunction restraining the defendants from maintaining a strike of the persons who before such strike were employed as lasters by the Randall Adams Company, a corporation, in its boot and shoe factory at Lynn, for the purpose of compelling or inducing the Randall Adams Company to cause Minas H. Minasian, the plaintiff in the second case, who was employed as a laster by the Randall Adams Company, to discharge from his employment as a helper Hampartzoon Minasian, the plaintiff in the first case, also praying for damages and for further relief.

In the Superior Court the cases were heard together by *Hitchcock,* J., who, with a recital that the pleadings were substantially

the same and the facts identical in the two cases, made a memorandum of findings applicable to both cases, in which he found the facts which are stated in the opinion. The judge made an order that the plaintiffs were severally entitled to an injunction as prayed for and to damages and costs. In each of the cases a final decree was entered in accordance with this order, and in each case the defendants appealed.

The cases were argued at the bar in March, 1911, before *Knowlton*, C. J., *Morton*, *Hammond*, *Braley*, & *Rugg*, JJ., and afterwards were submitted on briefs to all the justices then constituting the court except *DeCourcy*, J.

*F. W. Mansfield*, for the defendants.

*J. J. Feely*, (*R. Clapp* with him,) for the plaintiffs.

RUGG, C. J. The material facts which give rise to this controversy (as found by the judge of the Superior Court) are that the plaintiff Minas, a skilled laster by trade, had a contract for labor as a laster with the Randall Adams Company, terminable at the will of either. With the consent of his employer, he had in turn employed as helper his father, Hampartzoon, the other plaintiff, who was not able to do all the work of a laster, and who received no wages from the Randall Adams Company and had no relation as servant to it. The work was piece work, and Minas alone received, and was entitled to receive, the compensation for their joint labor. This method of work was known in the craft as "contract" or "cross-handed."

Both of the plaintiffs were, or had been, members of the Lasters' Union, an unincorporated association, of which the defendants are representatives and members. The defendant Osborne, who is the business agent of the Lasters' Union Local No. 1, notified the employer, the Randall Adams Company, that unless the father was discharged the shop's crew would be "pulled out." The father did not work for a day or two, but returned to work after the superintendent of the employer told the son, Minas, to get him and put him to work again. The next day all the other lasters went out on an orderly strike, which was indorsed by the Union. As a consequence, both plaintiffs have lost their employment. The Lasters' Union substantially controls the labor market in the manufacture of shoes, for practically all lasters are members of the Union. The effect of the strike, if continued, will be

to prevent Randall Adams Company from continuing business unless it discharges Minas or compels him to dispense with his assistant.

Here is a plain and tangible injury to the plaintiffs as the proximate result of the acts of the defendants. This gives a cause of action to the plaintiffs unless the defendants have a sufficient justification for their conduct. If they have acted without good cause or excuse, they are liable. *Berry* v. *Donovan,* 188 Mass. 353, 356. *Quin* v. *Leathem,* [1901] A. C. 495, 510. *South Wales Miners' Federation* v. *Glamorgan Coal Co.* [1905] A. C. 239, 244, 246, 251. As was said in *DeMinico* v. *Craig,* 207 Mass. 593, at 598, " Whether the purpose for which a strike is instituted is or is not a legal justification for it, is a question of law to be decided by the court."

The inquiry must be directed to the character of the justification proffered by the defendants in excuse for their conduct. The purpose of the strike (as found by the Superior Court) was " to compel the plaintiff Minas . . . to cease employing his father to help him and to induce the employer of Minas either to discharge the father or to require Minas to cease employing a helper, or, failing that, to discharge Minas from its employment." But it has been found also that the defendants are not actuated by any ill feeling toward either of the plaintiffs, and that the strike is wholly disconnected with any question of membership in the Union. The basis of the strike is objection to the system known as contract labor or cross-hand work. It follows that the real purpose of the strike is to cause the abolition of that system of work in this shop.

It is not of much consequence whether the object of the strike is stated to be the discharge of the father and son without hostility toward them, but for the reason that they practise a certain system of shop labor, or the abolition of the system of shop labor, with the incidental result that one or both of the plaintiffs may be discharged. In its practical effects upon the rights of the parties, the question of law involved is the same whichever way it is put.

The question presented for decision is whether the abolition of this particular system of shop work is a legal justification for the interference with the rights of these plaintiffs which arises from an orderly strike by fellow employees.

" The objection to the system is," as found by the trial judge, " that where two men worked together, as Minas and his father were doing, they can do more work in a day or a week than any single man working without a helper, and that as a result the men who worked without helpers would not get their fair share of the work that was to be done, and would thus be unable to have a chance to earn as much as they could if there were no helpers employed. The custom in the factory was that when a laster had completed his case of shoes or had nearly completed it so as to be ready for another case, he would put his name upon a list, and it was understood that cases of shoes would be furnished him for his work in the order in which the names stood upon the list. If there was plenty of work so that any laster could have all he could do, the fact that two men working together could do more than he could would not affect the wages he would ordinarily receive; but in case there was a scarcity of work, or not sufficient work to keep all the lasters employed, the laster who had a helper might be able to do more work and other lasters might not be able to obtain work. In that aspect of the case their compensation might be affected by the system of contract labor or cross-hand work." The controversy as presented upon this record is not between employer and employee, but between rival sets of workmen, both of whom were at work in the same shop upon materials of one manufacturer.

This is not a strike which involves any inquiry as to the plaintiffs' habits, conduct or character which might render them unfit or improper shopmates. It is not for the establishment of any system of shop work or rules directed to the curtailment or limitation of production or interference with reasonable industrial advancement. It is not aimed to prevent the highest efficiency of labor or the use of modern or economical machinery. It was not instituted to promote a closed shop or to compel anybody to join or to leave any union, nor primarily to cause the discharge or employment of any person or class of persons. If this results in any instance, it is incidental and not essential to the chief end. It does not go to the extent of interdicting the absolute and unqualified right of the individual to work, if he desires, contrary to the will or rules of a combination.

It is not based upon objections to shop rules established for the reasonable protection of the rights of the employer or promotion of the good order or economical and efficient service of employees.   It is not directed against the education of apprentices or those who are trying to learn the trade.   It does not appear to be for the establishment or preservation of a monopoly, and this is not indicated by the framework of the bill.   It is not directed against piece work as distinguished from day work, nor against any other method of employment where superior skill, dexterity or swiftness secures commensurately higher rewards than inefficiency, carelessness or slothfulness.   It does not directly or immediately affect the general convenience, necessities or safety of the public.   Its ostensible object is not used as a mask for any ulterior design.   The direct and main purpose is to secure a change in a system of work which is asserted to be unjust in its practical operation.

It is contended that this system in its final analysis resulted in an unequal distribution of the work of lasting in slack times and thus affected the wages of the strikers, although it did not so operate when there was work enough to keep all the employees busy all the time.   The finding of the Superior Court was in substance to this effect and it is supported by evidence.   There is nothing to indicate that the strike was not undertaken in good faith against this system.   An honest effort to better conditions of employment by laborers is lawful.   The right of the plaintiffs to work upon such terms as they chose is incident to the freedom of the individual.   That "right . . . could not be taken away . . . or interfered with by the defendants unless it came into conflict with an equal or superior right of theirs."   *DeMinico* v. *Craig*, 207 Mass. 593, 599.   The right of one person to dispose of his labor freely is not superior to the same rights in others.   The right of one to work under unsanitary conditions does not go to the extent of preventing others from striking in order to secure a mitigation of these conditions merely because such a strike may interfere with the desire of the first to continue to work under those conditions.   The same principle applies where a distribution of work discriminates between men of average capacity and gives an undue preference to one over

another in times when there is a dearth of work. A system of giving out work which, under existing conditions, operates unjustly, is a condition of employment in which all workmen affected by it in a particular shop may have a legal interest. Nor is injury to the employer a reason why a strike to remedy such a condition should be enjoined.

The right of the employer is no more absolute in respect of a condition of employment like this than it is as to hours of labor or rate of wages. It is not a subject as to which he is entitled to special protection against an orderly and otherwise lawful strike. *Pickett* v. *Walsh,* 192 Mass. 572. The conduct of these defendants, although directly affecting to their detriment the labor habits of the plaintiffs, appears to have sufficient justification in the fact that it is of a kind and for a purpose, which has a direct relation to the benefits of a more uniform distribution of work, and thus of wages among equally skilled or competent workmen during dull seasons. This was the object which the defendants were trying to obtain.

While the plaintiffs' contractual rights to labor, although terminable at will, were entitled to protection against wanton interference (*Citizens Loan Association* v. *Boston & Maine Railroad,* 196 Mass. 528, and cases cited), they were not so assured or valuable in their nature as are valid contracts for continued service for a definite period. It may well be that a stronger reason might be needed to justify interference with such contracts than with those here in question. We do not go beyond what is necessary to this decision.

The decision of this case depends upon a somewhat narrow interpretation of the findings of the trial court. Construing them as we do, this seems to be a clash of equal rights between fellow laborers, where each could use any lawful means to enforce those rights. No question is presented as to the unlawfulness of the means employed. This is not a case in its facts like those presented for adjudication in *Plant* v. *Woods,* 176 Mass. 492; *Vegelahn* v. *Guntner,* 167 Mass. 92; *Walker* v. *Cronin,* 107 Mass. 555; *Carew* v. *Rutherford,* 106 Mass. 1; *Sherry* v. *Perkins,* 147 Mass. 212; *Berry* v. *Donovan,* 188 Mass. 353; *Reynolds* v. *Davis,* 198 Mass. 294; *L. D. Willcutt & Sons Co.* v. *Driscoll,* 200 Mass. 110; *DeMinico* v. *Craig,* 207

Mass. 593; *Folsom* v. *Lewis*, 208 Mass. 336; but it comes within principles recognized and stated in several of those cases and applied in *Pickett* v. *Walsh*, 192 Mass. 572, at 579 *et seq.* In the opinion of a majority of the court the entry in each case must be

*Decree reversed; bill dismissed.*