16 So.2d 416

STEELE v. LOUISVILLE & N. R. CO. et al.

6 Div. 153.

Supreme Court of Alabama.

Jan. 13, 1944.

114

Arthur D. Shores, of Birmingham, and Charles H. Houston and Jos. C. Waddy, of Washington, D. C., for appellant.

Chas. H. Eyster, of Decatur, and White E. Gibson, of Birmingham, for appellee Louisville & N. R. Co.

Lange, Simpson, Brantlry & Robinson and John W. Lapsley, all of Birmingham, for appellee Brotherhood.

GARDNER, Chief Justice.

Complainant Steele filed this bill against the Louisville & Nashville Railroad Company, a corporation, the Brotherhood of Locomotive Firemen and Enginemen, an unincorporated association, and named individuals connected with the latter association. To the bill as last amended, which in fact is a substitute for the original bill, demurrers of the several defendants were sustained and the bill dismissed. From this decree the complainant prosecutes this appeal.

The argument of counsel for the respective parties has assumed a rather wide range, but we think the discussion here may be brought within a narrow compass. Omitting any detailed recital of the bill's averments, the salient facts are as follows:

Complainant is a Negro fireman, in the employ of the Louisville & Nashville Railroad since 1910, competent and rendering satisfactory service. Prior to the passage of the Railway Labor Act, and down to April 8, 1941, he had been serving as a fireman on a passenger train, assigned to what is known as the "South End Passenger Pool." This was a highly preferable job for a fireman. On April 1, 1941, the jobs of this particular pool were bulletined for "bidding in" because the number of firemen in the pool had to be reduced due to reduction in mileage, but by virtue of a contract entered into between the defendant Railroad and the Brotherhood of Locomotive Firemen and Enginemen in February, 1941, subsequently modified in May, 1941, complainant was thrown out of work for a period of sixteen days (April 8 to April 24, 1941), and firemen who were members of the Brotherhood given the preference. On April 25, 1941, he was given a job on a local freight run, less desirable as to the character of work and less remunerative. In December following, he was placed as fireman on a switch engine, and worked in that capacity until January

3, 1942, when he was re-assigned to his original place in the South End Passenger Pool.

Negro firemen are ineligible to membership in the defendant Brotherhood. Negroes are not employed on railroads as locomotive firemen except in the South. On the defendant Railroad there are four seniority districts, known as the South and North Alabama Division, the Montgomery and Mobile Division, the Mobile and New Orleans Division, and the Pensacola Division. On these four divisions Negro firemen are in the majority, but constitute a minority of the total number of firemen employed by the defendant Road. The Negro firemen and the Brotherhood firemen together comprise the entire craft or class of firemen employed by the Railroad. The defendant Brotherhood is the representative of the entire craft or class of firemen with the defendant Road, and is so accepted by complainant and the other Negro firemen. Complainant's employment is individual, and he asserts no seniority rights by virtue of any individual contract with the defendant Road.

As we understand the bill, with its exhibits, complainant's claim for seniority rights arose out of the agreement entered into between the defendant Road and the Locomotive Firemen and Hostlers on March 1, 1929. This agreement contains express stipulation that "the rates, rules, and working conditions as provided herein, shall be continued in effect, subject to 30 days' written notice by either party." Subsequently, as above noted, the defendant Brotherhood, under the Railway Labor Act, 45 U.S.C.A. §§ 151–188, became the representative for the entire craft of firemen, and entered into an agreement with the defendant Road which considerably curtailed seniority rights of complainant, and which gave ground for the selection of others, members of the Brotherhood, in his stead.

It further appears from the bill that locomotive engineers are obtained by promotion of selected white locomotive firemen. This is the existing railroad practice in the United States. To quote from the bill: "By traditional and universal railroad practice in the United States Negro firemen arbitrarily are never promoted to engineers regardless of knowledge, experience, competency, and worth." The bill further shows, to distinguish between white firemen as a class and Negro firemen as a class, the white firemen are known under standard railroad practice as "promotable men" while the Negro firemen are known as "non-promotable men."

On March 28, 1940, the defendant Brotherhood gave due notice to the various railroads involved, including this defendant Road, of a request for the establishment of rules governing the employment and assignment of locomotive firemen and helpers. This change in the previous agreement brought about the restrictions to non-promotable firemen and privileges to promotable firemen which worked to complainant's disadvantage as indicated. This was in March, 1940, and the formal agreement was entered into nearly a year thereafter in February, 1941.

The bill seeks injunctive relief against the enforcement of this agreement, which, as we view it, is in effect a bill for the specific performance of the agreement of March, 1929. Hewitt v. Magic City Furniture & Mfg. Co., 214 Ala. 265, 107 So. 745, 44 A.L.R. 1441; Donovan v. Travers, 285 Mass. 167, 188 N.E. 705.

In substance and effect the present bill appears to be the same as that presented by counsel for complainant here to the District Court of the United States for the Western District of Tennessee, which was disposed of upon the theory that no Federal question was properly presented. Teague v. Brotherhood of Locomotive Firemen and Enginemen, 6 Cir., 127 F.2d 53.

The recent cases of Switchmen's Union v. National Mediation Board, 64 S.Ct. 95, 88 L.Ed. ——; General Committee, Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad Co., 64 S.Ct. 146, 88 L.Ed. ——; and General Committee, Brotherhood of Locomotive Engineers v. Southern Pacific Co., 64 S.Ct. 142, 88 L.Ed. ——, have been called to our attention, but we are persuaded that the court was dealing only with the matter of the question of representation, and these authorities are here considered of no controlling importance.

Reverting to Teague v. Brotherhood of Locomotive Firemen and Enginemen, supra, we may add that the court in its opinion refers to the fact that in the last analysis complainant's seniority rights must rest upon contract, and that so far as the Fifth Amendment is concerned, it relates only to governmental action and not to action by private persons. This observation should suffice, without further elaboration,

118

as an answer to the constitutional question argued in brief.

■ So far as concerns the defendant Railroad, it has been definitely determined that the Railway Labor Act, 45 U.S.C.A. §§ 151–188, placed a mandatory duty upon the Railroad to treat with the representative of the employees and with that representative only. Virginian R. Co. v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 601, 81 L.Ed. 789. And for a willful failure, a rather heavy penalty is imposed. And under Sec. 152, 45 U.S.C.A., it is provided that the majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes therein named. In Virginian R. Co. v. System Federation, supra, it was pointed out in the opinion that the act did not purport to preclude individual contracts which the Railroad may elect to make directly with individual employees. "It imposes the affirmative duty to treat only with the true representative, and hence the negative duty to treat with no other." See also 31 Am. Jur. page 899. Speaking as to the purpose of the Act in the Virginian Railway case, the court further observed: "More is involved than the settlement of a private controversy without appreciable consequences to the public. The peaceable settlement of labor controversies, especially where they may seriously impair the ability of an interstate rail carrier to perform its service to the public, is a matter of public concern." In the instant case the Brotherhood was the true representative, with which the Railroad was under duty to confer and negotiate.

■ In Shaup v. Grand International Brotherhood of Locomotive Engineers, 223 Ala. 202, 135 So. 327, we made reference to the seniority rights which arose by virtue of the agreement between the Brotherhood and the Railroad, subject to be vacated just as were complainant's seniority rights under the 1929 agreement, where we observed that such a right was somewhat intangible and could not be denominated a vested property right. We indicated, however, that an unlawful invasion or interference therewith by a third person would constitute a wrong of which the courts would take cognizance; citing United States Fidelity & Guaranty Co. v. Millonas, 206 Ala. 147, 89 So. 732, 29 A.L.R. 520. They cannot be vested property rights in the true sense, for the simple reason that they are subject to be modified or taken away en-

tirely upon due notice, in accordance with the very terms of the contract.

■ As we have observed, the bill admits that complainant recognizes the defendant Brotherhood as its representative for collective bargaining with the Railroad. The Brotherhood, therefore, had a right to enter into the agreement of February, 1941, which modified to complainant's detriment the agreement of 1929. In Hartley v. Brotherhood of Ry. and S. S. Clerks, etc., 283 Mich. 201, 277 N.W. 885, 887, the Supreme Court of Michigan, speaking of these collective bargaining agreements, referred to the fact that the complainant's seniority rights in that case were not acquired by virtue of any contract of employment with her employer, but by reason of the bargaining agreement, and this agreement was executed for all the members of the Brotherhood and not for the individual benefit of the plaintiff. The court observed: "When, by reason of changed economic circumstances, it became apparent that the earlier agreement should be modified in the general interest of all members of the Brotherhood it was within the power of the latter to do so, notwithstanding the result thereof to plaintiff. The Brotherhood had the power by agreement with the Railway to create the seniority rights of plaintiff, and it likewise by the same method had the power to modify or destroy these rights in the interest of all the members."

A like line of reasoning was followed by the North Carolina court in Coley v. Atlantic Coast Line R. R., 221 N.C. 66, 19 S.E.2d 124. See also O'Keefe v. Local 463, 277 N.Y. 300, 14 N.E.2d 77, 117 A.L.R. 817; Cameron v. International Alliance, 118 N.J. Eq. 11, 176 A. 692, 97 A.L.R. 594; 31 Am. Jur. p. 896–899; note to Louisville & N. R. Co. v. Miller, 219 Ind. 389, 38 N.E.2d 239, 142 A.L.R. 1050; note to Piercy v. Louisville & N. R. Co., 198 Ky. 477, 248 S.W. 1042, 33 A.L.R. 322. The author of the note as found in 142 A.L.R. on page 1059, in speaking of the nature of seniority rights, observed: "As a starting point, the courts are apt to observe that seniority is not an inherent, natural, or constitutional right, and does not arise from mere employment, independently of contract, but exists by virtue of the contract between the employer and the union, inuring through the latter to the benefit of the members." Guided by these well-recognized principles, it is clear enough complainant must be held to abide by the contract made with his recognized statutory representative.

■ In referring to the Brotherhood as ·complainant's representative, we mean to indicate a representative in a limited sense only. Indeed, the Massachusetts court in Donovan v. Travers, supra, reached the conclusion that in no correct sense was the union an agent, but a principal. However that may be, to our mind it seems entirely ·clear that Congress, in providing for collective bargaining by representative of a ·craft or class, had no intention of creating a confidential relationship of principal and agent, such as would place a duty upon the agent·to give notice to every employee of any action which might unfavorably affect him, and to make a due account for his actions, and be subject to liability for failing to so account.

Complainant appears to rest his case largely upon the doctrine of such confidential relationship; citing Brasher v. First Nat. Bank, 232 Ala. 340, 168 So. 42; Rogers v. Brightman, 189 Ala. 228, 66 So. 71, where the exacting duties of such an agency are pointed out. But we think the Railway Labor Act merely intended that there be designated a representative chosen by the majority of the craft or class of employees to treat with the Railroad in regard to rates of pay, working conditions, and the like, and to bargain with reference to the whole without any notion of liability to the individual. See also System Federation v. Louisiana & A. R. Co., 5 Cir., 119 F.2d 509; System Federation v. Louisiana & A. R. Co., D.C., 32 F.Supp. 89.

■ As to the Railroad Company, the complaint rests upon a charge of conspiracy between the Road and the Brotherhood to defraud complainant of his seniority rights. Of course, the charge of conspiracy or fraud in general terms is insufficient. Facts must be alleged which would justify the legal conclusion of an unlawful conspiracy. "The illegal purpose or means, which the conspirators meant to accomplish or to resort to must be described accurately, for unless the object is illegal, or the means agreed upon illegal, there is no actionable wrong." National Park Bank v. Louisville & N. R. Co., 199 Ala. 192, 74 So. 69, 73.

■ When the facts alleged are considered, we think it clear enough no unlawful conspiracy is charged against the Railroad. As we have previously observed, the Road was under statutory duty, mandatory in character, to deal with the representative of the craft. True, the complainant, as a Negro fireman, is ineligible to membership in the defendant Brotherhood, but as observed by the New Jersey court in Cameron v. International Alliance, supra [118 N.J. Eq. 11, 176 A. 697, 97 A.L.R. 592]: "Trade union membership, like other contractual relationships, is purely voluntary on both sides. Such organizations come into being for purposes mutually agreed upon. The cohesive force is the common interest. Their right to prescribe qualifications for membership and to make rules and regulations for the transaction of their lawful business is not open to question. They may impose such requirements for admission and such formalities of election as may be deemed fit and proper; they may restrict membership to the original promoters, or limit the number to be thereafter admitted; the power of such a body to make its membership exclusive is incident to its character. * * * Enforced admission to membership is manifestly contrary to the scheme of such a society. No person has an abstract or absolute right to such membership."

This principle was likewise recognized by this court in the recent case of Chapman v. American Legion, 244 Ala. 553, 14 So.2d 225, 147 A.L.R. 585, in which latter citation many authorities are to be found in the note.

Like thought was expressed in the separate concurring opinion to be found in Brotherhood of Railway and S. S. Clerks v. United Transport S. E. A., App.D.C., 137 F.2d 817, 821, where it was said: "That the rules of the Brotherhood make negroes ineligible to membership is not a matter which concerns us." Counsel for complainant place much stress upon this authority. That case involved "red caps" who were ineligible to membership in the Brotherhood, but who insisted that the Brotherhood should not be considered their representative, and that they were entitled to one of their own choosing. The Mediation Board, however, considering that they were represented by the Brotherhood, denied their application for separate representation. The United States Circuit Court of Appeals for the District of Columbia held, in effect, that the finding of the Mediation Board was erroneous as a matter of law, and the judgment of the District Court setting aside the order was affirmed.

As we gather from the opinion of the Court of Appeals, the Mediation Board had held that these employees were in fact

merely a minority group of an established craft or class that did have representation. This opinion of the Court of Appeals was reversed by the Supreme Court of the United States without opinion. Brotherhood of Railway, etc., Employees v. United Transport Service Employees, 64 S.Ct. 260, 88 L.Ed. ——. Perhaps the reversal was rested upon the principle held decisive in Switchmen's Union v. National Mediation Board; General Committee, Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad Co.; and General Committee, Brotherhood of Locomotive Engineers v. Southern Pacific Co., supra, to the effect that the courts will decline to review the action of the Mediation Board in the matter of representation under the Railway Labor Act. However this may be, we think clearly the reversal could also have been rested .upon the theory, as outlined by the Mediation Board, that the "red caps" were already represented, and that the case merely presented a complaint on the part of a minority of the craft or class who were disappointed with the representative the majority had selected.

In any event, the instant case is much stronger for the defendants. Here there is no question of representation. The bill discloses upon its face that the Brotherhood has been delegated under the Railway Labor Act as representative of the craft or class to which complainant belongs, and has been so acting and so recognized as the representative for many years.

In Washington Terminal Co. v. Boswell, 75 U.S.App.D.C. 1, 124 F.2d 235, 247, is found a comprehensive review of the Railway Labor Act. It was designed, as stated in the opinion, "not to outlaw the right to strike, but merely to prevent the necessity for its exercise." And in Virginian R. Co. v. System Federation, supra, the court noted the fact that in this Act more is involved than the settlement of a private controversy without appreciable consequences to the public. "The peaceable settlement of labor controversies, especially where they may seriously impair the ability of an interstate rail carrier to perform its service to the public, is a matter of public concern."

Considering, therefore, the situation as thus presented to the Railroad, the question at once occurs to a practical mind: What step was the Road to take? The representative of the craft, the Brotherhood, had made a request for a modification of the existing contract concerning seniority rights. Was it the duty of the Road to combat the representative and enter into an argument as to its resultant effect upon employees who were in the minority? The operation of a railroad presents many complex problems. Among the most serious are those involving its relationship with its employees, as well as with the public at large, and their responsibilities as to the safety of the travelling public. It requires not only skill in management and in the actual operation by the employees, but it requires cooperation among the employees, as well as with the management. There was nothing hasty in the acceptance of the Brotherhood's proposal. Nearly a year had passed from the time the request was made until its final acceptance.

The Railway Labor Act was careful to preserve to the individual employee the right of conference with the management, either individually or through a local representative of the employees. Sec. 152, 45 U.S.C.A., supra. There was no requirement, either in the Act or in the rules or regulations of the Brotherhood, which called for notice to the individual employee of a change in the contract.

■ The defendant Road had all these complex matters for consideration. As we have previously noted, the bill discloses a traditional policy of the railroads throughout the country to promote to the position of engineer white firemen only. This means, of course, that such course had been considered by the management as wise and proper throughout the history of the railroads in America. Complainant has long been in the service, and knew of this unbroken custom. He therefore knew that he would not be eligible for promotion to the position of engineer. So uniform a custom, therefore, recognized in the practical construction of his contract of employment, must be considered as a part thereof. City of Greenville v. Greenville Water Works, 125 Ala. 625, 27 So. 764; Bixby-Theisen Co. v. Evans, 174 Ala. 571, 57 So. 39; Birmingham Waterworks Co. v. Hernandez, 196 Ala. 438, 71 So. 443, L.R.A. 1916E, 258; Mitau v. Roddan, 149 Cal. 1, 84 P. 145, 6 L.R.A.,N.S., 275.

■ It is, of course, necessary that the engineer be promoted from his position of fireman; but practical considerations also require he likewise have had, as fireman, experience over the run to which he is like-

ly to be promoted to engineer. This modified contract of which complainant complains was in harmony with the Railroad's policy, and lends support to its theory of operating successfully a great transportation system. As was said in Washington Terminal Co. v. Boswell, supra, the railroad still "has the power of management." Freedom of individual enterprise is regarded as one of the cornerstones of our form of government. This freedom, under the police power, is subject to many restrictions for the public good, recognized in innumerable decisions following legislation to that end. Such freedom of enterprise is restricted as to the railroads in instances too numerous to mention, among them the Railway Labor Act. But no act of Congress has yet been enacted which interferes with the management of the Road in so far as the question of the selection of its individual employees is concerned. If the Road considers it wiser to continue the policy of having only white engineers, there is no more a law standing in the way of the exercise of this freedom of choice than there is in the choice of the Brotherhood of its membership. And it is clear enough the courts have no power to declare otherwise or to dictate a different policy.

In Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 1140, 41 L.Ed. 256, many observations were made concerning laws relating to the separation of races. That it is a question of much delicacy, history teaches and all men know. In the Plessy case, supra, the court said: "Laws permitting, and even requiring, their separation, in places where they are liable to be brought into contact, do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally, recognized as within the competency of the state legislatures in the exercise of their police power. The most common instance of this is connected with the establishment of separate schools for white and colored children, which have been held to be a valid exercise of the legislative power even by courts of states where the political rights of the colored race have been longest and most earnestly enforced. * * * In determining the question of reasonableness, it is at liberty to act with reference to the established usages, customs, and traditions of the people, and with a view to the promotion of their comfort, and the preservation of the public peace and good order. * * * Legislation is powerless to eradicate racial instincts, or to abolish distinctions based upon physical differences, and the attempt to do so can only result in accentuating the difficulties of the present situation."

Considering, therefore, the averments of fact, the bill merely discloses that the Road has signed an agreement with the Brotherhood, the representative of the entire craft, which in fact is in harmony with its traditional policy. The Railroad, in entering into this agreement, did nothing illegal and pursued no illegal means. As a consequence, it was guilty of no actionable wrong. National Park Bank v. Louisville & N. R. Co., supra. This conclusion makes it clear the complainant is entitled to no specific performance of the contract of 1929 by mandatory injunction against the agreement of 1941.

The same rule of law concerning the necessity for charging facts to show a conspiracy is applicable to the charge of fraud, as against the Brotherhood and the individual defendants. Fraud is never presumed, and the facts upon which the charge is based must be clearly stated. Winn v. Winn, 242 Ala. 324, 6 So.2d 401; Birmingham Trust & Savings Co. v. Shelton, 231 Ala. 62, 163 So. 593; Broom v. Douglass, 175 Ala. 268, 57 So. 860, 44 L.R.A.,N.S., 164, Ann.Cas.1914C, 1155; 24 Am.Jur. p. 88.

Certainly the management of the Railroad has as much right to take into consideration this delicate problem as does the law-making body of any state in passing laws looking to the peace and good order of society. The very object of the Railway Labor Act was to provide for the public safety an uninterrupted transportation system.

We think a consideration of the facts alleged as to the Brotherhood leads to the same conclusion we have arrived at concerning the defendant Railroad. In substance and effect complainant's case is rested against the Brotherhood upon the theory that it was under a duty to give the minority employees, non-members of the Brotherhood, notice of any action to be taken which would in any manner detrimentally affect their seniority rights. We have expressed our view that no such duty rested upon it. So considered, therefore, the charge of fraud amounts largely merely to an accusation that the Brotherhood is looking largely to the interests of its own membership to the detriment of complainant. Even should this be conceded, yet at the

same time the action of the Brotherhood looks to the welfare of the majority of the craft, and has the same basic foundation that underlies the Road management. It looks to a compliance with the traditional custom of the Road to have only white engineers. There is no charge of bad faith or malice against the complainant or any of his class. O'Keefe v. Local 463, 277 N. Y. 300, 14 N.E.2d 775, 117 A.L.R. 823. The charge is, that by entering into this latter agreement, which, as we have observed, is in·line with the policy of the Railroad management, the Brotherhood has fraudulently disrupted complainant's seniority rights. True, complainant in this particular case does not seek to be placed in the promotable class; that is, he does not seek to be declared in this suit eligible for the position of engineer. But our previous discussion discloses that a recognition of the principles for which he contends here will ultimately lead to that end. If the Brotherhood is his confidential agent, and must look to his interest, it must look to his promotion in the final analysis. Complainant is in the minority group of his craft, and if he suffers any hardship, it is due to the fact of control of the majority, which can in no event be considered as a fraud, either in law or fact.

There are numerous instances where individual hardships have been suffered for the good of the whole. The New York court in O'Keefe v. Local 463, 277 N.Y. 300, 14 N.E.2d 77, 80, 117 A.L.R. 817, speaking to this question, said: "The question presented upon the appeal is whether under its constitution and by-laws the union has power and right to take action reasonably calculated to advance its objects, even though such action involves interference with the employment of a member who has committed no wrong and against whom no charges have been preferred. This court has frequently sustained the right of labor unions to interfere by lawful means between an employer and his employees who are not members of the union where the purpose of such interference is solely to advance the interest of the members of the union. We have not been oblivious of the consequent hardship imposed, at times, upon individual employers or employees, but for hardship to the individual resulting from action reasonably calculated to achieve a lawful end by lawful means the court can give no redress. * * * The objects sought by a union and the 'unity of

action' to achieve them cannot be attained without some harm to the individual."

Another illustration is to be found in the Massachusetts case of Minasian v. Osborne, 210 Mass. 250, 96 N.E. 1036, 37 L.R.A., N.S., 179, where a son lost employment for the reason that he had his father as a helper. And another, involving the loss of employment by a married woman, is found stated in Hartley v. Brotherhood of Ry. and S. S. Clerks, supra. The court observed in this latter case: "The Brotherhood had the power by agreement with the Railway to create the seniority rights of plaintiff, and it likewise by the same method had the power to modify or destroy these rights in the interest of all the members."

Congress has made no effort to control the matter of seniority rights. It has left that to contract between the parties. That contract has been entered into which detrimentally affects complainant's seniority rights, but it was made by his representative, and it is in conformity with the uniform and traditional practice of the Road. It is a lawful contract entered into in a lawful manner, and the facts alleged fail to show any conduct on the part of the Brotherhood that creates in complainant an actionable wrong.

In the discussion of this case we have left to one side many questions presented by the demurrer and argued by counsel for defendants, some of which may give rise to serious consideration.

The Shaup case, supra, involved no attempt to charge fraud or bad faith, and the weight of authority decidedly supports the view there taken. Grand Int. Brotherhood of Locomotive Engineers v. Mills, 43 Ariz. 379, 31 P.2d 971. There are numerous authorities, however, tending to support the view that a court of equity will lend its aid in protection of seniority rights which are fraudulently and illegally interfered with. 142 A.L.R. 1067. This question, as well as all others, becomes one of secondary consideration in view of the conclusion reached that the bill states no cause of action in any form. We, therefore, prefer to rest our decision upon the fundamental meritorious question sought to be presented.

We are at the conclusion, therefore, that the demurrer was properly sustained and the decree appealed from is due to be affirmed. It is so ordered.

Affirmed.

All the Justices concur.