## STEELE *v.* LOUISVILLE & NASHVILLE RAILROAD CO. ET AL.

No. 45.  Argued November 14, 15, 1944.—Decided December 18, 1944.

*Mr. Charles H. Houston,* with whom *Mr. Arthur D. Shores* was on the brief, for petitioner.

*Mr. Charles H. Eyster,* with whom *Mr. White E. Gibson* was on the brief, for the Louisville & Nashville Railroad Co.; and *Mr. James A. Simpson,* with whom *Messrs. Harold C. Heiss, Russell B. Day,* and *John W. Lapsley* were on the brief, for the Brotherhood of Locomotive Firemen & Enginemen et al., respondents.

*Solicitor General Fahy, Messrs. Robert L. Stern, Alvin J. Rockwell, Joseph B. Robison, Frank Donner, Marcel Mallet-Provost* and *Miss Ruth Weyand* filed a brief on behalf of the United States; *Messrs. Thurgood Marshall* and *William H. Hastie* on behalf of the National Association for the Advancement of Colored People; and *Messrs. Edgar Watkins, John D. Miller, Arthur Garfield Hays, R. Beverley Herbert,* and *T. Pope Shepherd* on behalf of the American Civil Liberties Union, as *amici curiae,* in support of petitioner.

Mr. Chief Justice Stone delivered the opinion of the Court.

The question is whether the Railway Labor Act, 48 Stat. 1185, 45 U. S. C. §§ 151 *et seq.,* imposes on a labor organi-

zation, acting by authority of the statute as the exclusive bargaining representative of a craft or class of railway employees, the duty to represent all the employees in the craft without discrimination because of their race, and, if so, whether the courts have jurisdiction to protect the minority of the craft or class from the violation of such obligation.

The issue is raised by demurrer to the substituted amended bill of complaint filed by petitioner, a locomotive fireman, in a suit brought in the Alabama Circuit Court against his employer, the Louisville & Nashville Railroad Company, the Brotherhood of Locomotive Firemen and Enginemen, an unincorporated labor organization, and certain individuals representing the Brotherhood. The Circuit Court sustained the demurrer, and the Supreme Court of Alabama affirmed. 245 Ala. 113, 16 So. 2d 416. We granted certiorari, 322 U. S. 722, the question presented being one of importance in the administration of the Railway Labor Act.

The allegations of the bill of complaint, so far as now material, are as follows: Petitioner, a Negro, is a locomotive fireman in the employ of respondent Railroad, suing on his own behalf and that of his fellow employees who, like petitioner, are Negro firemen employed by the Railroad. Respondent Brotherhood, a labor organization, is, as provided under § 2, Fourth of the Railway Labor Act, the exclusive bargaining representative of the craft of firemen employed by the Railroad and is recognized as such by it and the members of the craft. The majority of the firemen employed by the Railroad are white and are members of the Brotherhood, but a substantial minority are Negroes who, by the constitution and ritual of the Brotherhood, are excluded from its membership. As the membership of the Brotherhood constitutes a majority of all firemen employed on respondent Railroad, and as under § 2, Fourth the members because they are the ma-

jority have the right to choose and have chosen the Brotherhood to represent the craft, petitioner and other Negro firemen on the road have been required to accept the Brotherhood as their representative for the purposes of the Act.

On March 28, 1940, the Brotherhood, purporting to act as representative of the entire craft of firemen, without informing the Negro firemen or giving them opportunity to be heard, served a notice on respondent Railroad and on twenty other railroads operating principally in the southeastern part of the United States. The notice announced the Brotherhood's desire to amend the existing collective bargaining agreement in such manner as ultimately to exclude all Negro firemen from the service. By established practice on the several railroads so notified only white firemen can be promoted to serve as engineers, and the notice proposed that only "promotable," i. e. white, men should be employed as firemen or assigned to new runs or jobs or permanent vacancies in established runs or jobs.

On February 18, 1941, the railroads and the Brotherhood, as representative of the craft, entered into a new agreement which provided that not more than 50% of the firemen in each class of service in each seniority district of a carrier should be Negroes; that until such percentage should be reached all new runs and all vacancies should be filled by white men; and that the agreement did not sanction the employment of Negroes in any seniority district in which they were not working. The agreement reserved the right of the Brotherhood to negotiate for further restrictions on the employment of Negro firemen on the individual railroads. On May 12, 1941, the Brotherhood entered into a supplemental agreement with respondent Railroad further controlling the seniority rights of Negro firemen and restricting their employment. The Negro firemen were not given notice or opportunity to be

heard with respect to either of these agreements, which were put into effect before their existence was disclosed to the Negro firemen.

Until April 8, 1941, petitioner was in a "passenger pool," to which one white and five Negro firemen were assigned. These jobs were highly desirable in point of wages, hours and other considerations. Petitioner had performed and was performing his work satisfactorily. Following a reduction in the mileage covered by the pool, all jobs in the pool were, about April 1, 1941, declared vacant. The Brotherhood and the Railroad, acting under the agreement, disqualified all the Negro firemen and replaced them with four white men, members of the Brotherhood, all junior in seniority to petitioner and no more competent or worthy. As a consequence petitioner was deprived of employment for sixteen days and then was assigned to more arduous, longer, and less remunerative work in local freight service. In conformity to the agreement, he was later replaced by a Brotherhood member junior to him, and assigned work on a switch engine, which was still harder and less remunerative, until January 3, 1942. On that date, after the bill of complaint in the present suit had been filed, he was reassigned to passenger service.

Protests and appeals of petitioner and his fellow Negro firemen, addressed to the Railroad and the Brotherhood, in an effort to secure relief and redress, have been ignored. Respondents have expressed their intention to enforce the agreement of February 18, 1941 and its subsequent modifications. The Brotherhood has acted and asserts the right to act as exclusive bargaining representative of the firemen's craft. It is alleged that in that capacity it is under an obligation and duty imposed by the Act to represent the Negro firemen impartially and in good faith; but instead, in its notice to and contracts with the railroads, it has been hostile and disloyal to the Negro firemen, has deliberately discriminated against them, and has sought

to deprive them of their seniority rights and to drive them out of employment in their craft, all in order to create a monopoly of employment for Brotherhood members.

The bill of complaint asks for discovery of the manner in which the agreements have been applied and in other respects; for an injunction against enforcement of the agreements made between the Railroad and the Brotherhood; for an injunction against the Brotherhood and its agents from purporting to act as representative of petitioner and others similarly situated under the Railway Labor Act, so long as the discrimination continues, and so long as it refuses to give them notice and hearing with respect to proposals affecting their interests; for a declaratory judgment as to their rights; and for an award of damages against the Brotherhood for its wrongful conduct.

The Supreme Court of Alabama took jurisdiction of the cause but held on the merits that petitioner's complaint stated no cause of action.[1] It pointed out that the Act places a mandatory duty on the Railroad to treat with the Brotherhood as the exclusive representative of the employees in a craft, imposes heavy criminal penalties for willful failure to comply with its command, and provides

---

[1] The respondents urge that the Circuit Court sustained their demurrers on the ground that the suit could not be maintained against the Brotherhood, an unincorporated association, since by Alabama statute such an association cannot be sued unless the action lies against all its members individually, and on several other state-law grounds. They argue accordingly that the judgment of affirmance of the state Supreme Court may be rested on an adequate non-federal ground. As that court specifically rested its decision on the sole ground that the Railway Labor Act places no duty upon the Brotherhood to protect petitioner and other Negro firemen from the alleged discriminatory treatment, the judgment rests wholly on a federal ground, to which we confine our review. *Grayson* v. *Harris*, 267 U. S. 352, 358; *International Steel Co.* v. *National Surety Co.*, 297 U. S. 657, 666; *Indiana ex rel. Anderson* v. *Brand*, 303 U. S. 95, 98, 99 and cases cited.

that the majority of any craft shall have the right to determine who shall be the representative of the class for collective bargaining with the employer, see *Virginian R. Co.* v. *System Federation,* 300 U. S. 515, 545. It thought that the Brotherhood was empowered by the statute to enter into the agreement of February 18, 1941, and that by virtue of the statute the Brotherhood has power by agreement with the Railroad both to create the seniority rights of petitioner and his fellow Negro employees and to destroy them. It construed the statute, not as creating the relationship of principal and agent between the members of the craft and the Brotherhood, but as conferring on the Brotherhood plenary authority to treat with the Railroad and enter into contracts fixing rates of pay and working conditions for the craft as a whole without any legal obligation or duty to protect the rights of minorities from discrimination or unfair treatment, however gross. Consequently it held that neither the Brotherhood nor the Railroad violated any rights of petitioner or his fellow Negro employees by negotiating the contracts discriminating against them.

If, as the state court has held, the Act confers this power on the bargaining representative of a craft or class of employees without any commensurate statutory duty toward its members, constitutional questions arise. For the representative is clothed with power not unlike that of a legislature which is subject to constitutional limitations on its power to deny, restrict, destroy or discriminate against the rights of those for whom it legislates and which is also under an affirmative constitutional duty equally to protect those rights. If the Railway Labor Act purports to impose on petitioner and the other Negro members of the craft the legal duty to comply with the terms of a contract whereby the representative has discriminatorily restricted their employment for the benefit and advantage of the Brotherhood's own members, we

must decide the constitutional questions which petitioner raises in his pleading.

But we think that Congress, in enacting the Railway Labor Act and authorizing a labor union, chosen by a majority of a craft, to represent the craft, did not intend to confer plenary power upon the union to sacrifice, for the benefit of its members, rights of the minority of the craft, without imposing on it any duty to protect the minority. Since petitioner and the other Negro members of the craft are not members of the Brotherhood or eligible for membership, the authority to act for them is derived not from their action or consent but wholly from the command of the Act. Section 2, Fourth provides: "Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this Act. . . ." Under §§ 2, Sixth and Seventh, when the representative bargains for a change of working conditions, the latter section specifies that they are the working conditions of employees "as a class." Section 1, Sixth of the Act defines "representative" as meaning "Any person or . . . labor union . . . designated either by a carrier or group of carriers or by its or their employees, to act for it or them." The use of the word "representative," as thus defined and in all the contexts in which it is found, plainly implies that the representative is to act on behalf of all the employees which, by virtue of the statute, it undertakes to represent.

By the terms of the Act, § 2, Fourth, the employees are permitted to act "through" their representative, and it represents them "for the purposes of" the Act. Sections 2, Third, Fourth, Ninth. The purposes of the Act declared by § 2 are the avoidance of "any interruption to commerce or to the operation of any carrier engaged therein," and this aim is sought to be achieved by encouraging "the

prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions." Compare *Texas & New Orleans R. Co.* v. *Brotherhood of Clerks,* 281 U. S. 548, 569. These purposes would hardly be attained if a substantial minority of the craft were denied the right to have their interests considered at the conference table and if the final result of the bargaining process were to be the sacrifice of the interests of the minority by the action of a representative chosen by the majority. The only recourse of the minority would be to strike, with the attendant interruption of commerce, which the Act seeks to avoid.

Section 2, Second, requiring carriers to bargain with the representative so chosen, operates to exclude any other from representing a craft. *Virginian R. Co.* v. *System Federation, supra,* 545. The minority members of a craft are thus deprived by the statute of the right, which they would otherwise possess, to choose a representative of their own, and its members cannot bargain individually on behalf of themselves as to matters which are properly the subject of collective bargaining. *Order of Railroad Telegraphers* v. *Railway Express Agency,* 321 U. S. 342, and see under the like provisions of the National Labor Relations Act *J. I. Case Co.* v. *Labor Board,* 321 U. S. 332, and *Medo Photo Supply Corp.* v. *Labor Board,* 321 U. S. 678.

The labor organization chosen to be the representative of the craft or class of employees is thus chosen to represent all of its members, regardless of their union affiliations or want of them. As we have pointed out with respect to the like provision of the National Labor Relations Act in *J. I. Case Co.* v. *Labor Board, supra,* 338, "The very purpose of providing by statute for the collective agreement is to supersede the terms of separate agreements of employees with terms which reflect the strength and bargaining power and serve the welfare of the group. Its benefits and advantages are open to every employee of the repre-

sented unit. . . ." The purpose of providing for a representative is to secure those benefits for those who are represented and not to deprive them or any of them of the benefits of collective bargaining for the advantage of the representative or those members of the craft who selected it.

As the National Mediation Board said in In The Matter of Representation of Employees of the St. Paul Union Depot Company, Case No. R–635: "Once a craft or class has designated its representative, such representative is responsible under the law to act for all employees within the craft or class, those who are not members of the represented organization, as well as those who are members." [2]

Unless the labor union representing a craft owes some duty to represent non-union members of the craft, at least to the extent of not discriminating against them as such in the contracts which it makes as their representative, the minority would be left with no means of protecting their interests or, indeed, their right to earn a livelihood by pursuing the occupation in which they are employed.

---

[2] The Mediation Board's decision in this case was set aside in *Brotherhood of Clerks* v. *United Transport Service Employees*, 137 F. 2d 817, reversed on jurisdictional grounds, 320 U. S. 715. The Court of Appeals was of the opinion that a representative is not only required to act in behalf of all the employees in a bargaining unit, but that a labor organization which excludes a minority of a craft from its membership has no standing to act as such representative of the minority.

The Act has been similarly interpreted by the Emergency Board referred to in *General Committee* v. *Southern Pacific Co.*, 320 U. S. 338, 340, 342–343 n. It declared in 1937: "When a craft or class, through representatives chosen by a majority, negotiates a contract with a carrier, all members of the craft or class share in the rights secured by the contract, regardless of their affiliations with any organization of employees . . . The representatives of the majority represent the whole craft or class in the making of an agreement for the benefit of all. . . ."

While the majority of the craft chooses the bargaining representative, when chosen it represents, as the Act by its terms makes plain, the craft or class, and not the majority. The fair interpretation of the statutory language is that the organization chosen to represent a craft is to represent all its members, the majority as well as the minority, and it is to act for and not against those whom it represents.[3] It is a principle of general application that the exercise of a granted power to act in behalf of others involves the assumption toward them of a duty to exercise the power in their interest and behalf, and that such a grant of power will not be deemed to dispense with all duty toward those for whom it is exercised unless so expressed.

We think that the Railway Labor Act imposes upon the statutory representative of a craft at least as exacting a duty to protect equally the interests of the members of the craft as the Constitution imposes upon a legislature to give equal protection to the interests of those for whom it legislates. Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents, cf. *J. I. Case Co.* v. *Labor Board, supra,* 335, but it has also imposed on the representative a corresponding duty. We hold that the language of the Act to which we have referred, read in the light of the purposes of the Act, expresses the aim of Congress to impose on the bargaining representative of a craft

---

[3] Compare the House Committee Report on the N. L. R. A. (H. Rep. No. 1147, 74th Cong., 1st Sess., pp. 20–22) indicating that although the principle of majority rule "written into the statute books by Congress in the Railway Labor Act of 1934" was to be applicable to the bargaining unit under the N. L. R. A., the employer was required to give "equally advantageous terms to nonmembers of the labor organization negotiating the agreement." See also the Senate Committee Report on the N. L. R. A. to the same effect. S. Rep. No. 573, 74th Cong., 1st Sess., p. 13.

or class of employees the duty to exercise fairly the power conferred upon it in behalf of all those for whom it acts, without hostile discrimination against them.

This does not mean that the statutory representative of a craft is barred from making contracts which may have unfavorable effects on some of the members of the craft represented. Variations in the terms of the contract based on differences relevant to the authorized purposes of the contract in conditions to which they are to be applied, such as differences in seniority, the type of work performed, the competence and skill with which it is performed, are within the scope of the bargaining representation of a craft, all of whose members are not identical in their interest or merit. Cf. *Carmichael* v. *Southern Coal Co.*, 301 U. S. 495, 509–510, 512 and cases cited; *Washington* v. *Superior Court*, 289 U. S. 361, 366; *Metropolitan Casualty Co.* v. *Brownell,* 294 U. S. 580, 583. Without attempting to mark the allowable limits of differences in the terms of contracts based on differences of conditions to which they apply, it is enough for present purposes to say that the statutory power to represent a craft and to make contracts as to wages, hours and working conditions does not include the authority to make among members of the craft discriminations not based on such relevant differences. Here the discriminations based on race alone are obviously irrelevant and invidious. Congress plainly did not undertake to authorize the bargaining representative to make such discriminations. Cf. *Yick Wo* v. *Hopkins*, 118 U. S. 356; *Yu Cong Eng* v. *Trinidad,* 271 U. S. 500; *Missouri ex rel. Gaines* v. *Canada,* 305 U. S. 337; *Hill* v. *Texas,* 316 U. S. 400.

The representative which thus discriminates may be enjoined from so doing, and its members may be enjoined from taking the benefit of such discriminatory action. No more is the Railroad bound by or entitled to take the benefit of a contract which the bargaining representative

is prohibited by the statute from making. In both cases the right asserted, which is derived from the duty imposed by the statute on the bargaining representative, is a federal right implied from the statute and the policy which it has adopted. It is the federal statute which condemns as unlawful the Brotherhood's conduct. "The extent and nature of the legal consequences of this condemnation, though left by the statute to judicial determination, are nevertheless to be derived from it and the federal policy which it has adopted." *Deitrick* v. *Greaney,* 309 U. S. 190, 200–201; *Board of County Commissioners* v. *United States,* 308 U. S. 343; *Sola Electric Co.* v. *Jefferson Co.,* 317 U. S. 173, 176–7; cf. *Clearfield Trust Co.* v. *United States,* 318 U. S. 363.

So long as a labor union assumes to act as the statutory representative of a craft, it cannot rightly refuse to perform the duty, which is inseparable from the power of representation conferred upon it, to represent the entire membership of the craft. While the statute does not deny to such a bargaining labor organization the right to determine eligibility to its membership, it does require the union, in collective bargaining and in making contracts with the carrier, to represent non-union or minority union members of the craft without hostile discrimination, fairly, impartially, and in good faith. Wherever necessary to that end, the union is required to consider requests of non-union members of the craft and expressions of their views with respect to collective bargaining with the employer and to give to them notice of and opportunity for hearing upon its proposed action.

Since the right asserted by petitioner "is . . . claimed under the Constitution" and a "statute of the United States," the decision of the Alabama court, adverse to that contention is reviewable here under § 237 (b) of the Judicial Code, unless the Railway Labor Act itself has excluded petitioner's claims from judicial consideration. The ques-

tion here presented is not one of a jurisdictional dispute, determinable under the administrative scheme set up by the Act, cf. *Switchmen's Union* v. *National Mediation Board*, 320 U. S. 297; *General Committee* v. *M.-K.-T. R. Co.*, 320 U. S. 323; *General Committee* v. *Southern Pacific Co.*, 320 U. S. 338; *Brotherhood of Clerks* v. *United Transport Service Employees*, 320 U. S. 715, 816, or restricted by the Act to voluntary settlement by recourse to the traditional implements of mediation, conciliation and arbitration. *General Committee* v. *M.-K.-T. R. Co., supra,* 332, 337. There is no question here of who is entitled to represent the craft, or who are members of it, issues which have been relegated for settlement to the Mediation Board, *Switchmen's Union* v. *National Mediation Board, supra; General Committee* v. *M.-K.-T. R. Co., supra.* Nor are there differences as to the interpretation of the contract which by the Act are committed to the jurisdiction of the Railroad Adjustment Board.

Section 3, First (i), which provides for reference to the Adjustment Board of "disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements," makes no reference to disputes between employees and their representative. Even though the dispute between the railroad and the petitioner were to be heard by the Adjustment Board, that Board could not give the entire relief here sought. The Adjustment Board has consistently declined in more than 400 cases to entertain grievance complaints by individual members of a craft represented by a labor organization. "The only way that an individual may prevail is by taking his case to the union and causing the union to carry it through to the Board." Administrative Procedure in Government Agencies, S. Doc. No. 10, 77th Cong., 1st Sess., Pt. 4, p. 7. Whether or not judicial power might be exerted to require the Adjustment Board to consider individual grievances,

as to which we express no opinion, we cannot say that there is an administrative remedy available to petitioner or that resort to such proceedings in order to secure a possible administrative remedy, which is withheld or denied, is prerequisite to relief in equity. Further, since § 3, First (c) permits the national labor organizations chosen by the majority of the crafts to "prescribe the rules under which the labor members of the Adjustment Board shall be selected" and to "select such members and designate the division on which each member shall serve," the Negro firemen would be required to appear before a group which is in large part chosen by the respondents against whom their real complaint is made. In addition § 3, Second provides that a carrier and a class or craft of employees, "all acting through their representatives, selected in accordance with the provisions of this Act," may agree to the establishment of a regional board of adjustment for the purpose of adjusting disputes of the type which may be brought before the Adjustment Board. In this way the carrier and the representative against whom the Negro firemen have complained have power to supersede entirely the Adjustment Board's procedure and to create a tribunal of their own selection to interpret and apply the agreements now complained of to which they are the only parties. We cannot say that a hearing, if available, before either of these tribunals would constitute an adequate administrative remedy. Cf. *Tumey* v. *Ohio,* 273 U. S. 510. There is no administrative means by which the Negro firemen can secure separate representation for the purposes of collective bargaining. For the Mediation Board "has definitely ruled that a craft or class of employees may not be divided into two or more on the basis of race or color for the purpose of choosing representatives." [4]

---

[4] National Mediation Board, The Railway Labor Act and the National Mediation Board, p. 17; see In the Matter of Representation of Employees of the Central of Georgia Ry. Co., Case No. R–234;

In the absence of any available administrative remedy, the right here asserted, to a remedy for breach of the statutory duty of the bargaining representative to represent and act for the members of a craft, is of judicial cognizance. That right would be sacrificed or obliterated if it were without the remedy which courts can give for breach of such a duty or obligation and which it is their duty to give in cases in which they have jurisdiction. *Switchmen's Union* v. *National Mediation Board, supra,* 300; *Stark* v. *Wickard,* 321 U. S. 288, 306–7. Here, unlike *General Committee* v. *M.-K.-T. R. Co., supra,* and *General Committee* v. *Southern Pacific Co., supra,* there can be no doubt of the justiciability of these claims. As we noted in *General Committee* v. *M.-K.-T. R. Co., supra,* 331, the statutory provisions which are in issue are stated in the form of commands. For the present command there is no mode of enforcement other than resort to the courts, whose jurisdiction and duty to afford a remedy for a breach of statutory duty are left unaffected. The right is analogous to the statutory right of employees to require the employer to bargain with the statutory representative of a craft, a right which this Court has enforced and protected by its injunction in *Texas & New Orleans R. Co.* v. *Brotherhood of Clerks, supra,* 556–557, 560, and in *Virginian R. Co.* v. *System Federation, supra,* 548, and like it is one for which there is no available administrative remedy.

We conclude that the duty which the statute imposes on a union representative of a craft to represent the interests of all its members stands on no different footing and that the statute contemplates resort to the usual judicial remedies of injunction and award of damages when appropriate for breach of that duty.

---

In the Matter of Representation of Employees of the St. Paul Union Depot Co., Case No. R–635, set aside in *Brotherhood of Clerks* v. *United Transport Service Employees,* 137 F. 2d 817, reversed on jurisdictional grounds, 320 U. S. 715.

The judgment is accordingly reversed and remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE BLACK concurs in the result.

MR. JUSTICE MURPHY, concurring.

The economic discrimination against Negroes practiced by the Brotherhood and the railroad under color of Congressional authority raises a grave constitutional issue that should be squarely faced.

The utter disregard for the dignity and the well-being of colored citizens shown by this record is so pronounced as to demand the invocation of constitutional condemnation. To decide the case and to analyze the statute solely upon the basis of legal niceties, while remaining mute and placid as to the obvious and oppressive deprivation of constitutional guarantees, is to make the judicial function something less than it should be.

The constitutional problem inherent in this instance is clear. Congress, through the Railway Labor Act, has conferred upon the union selected by a majority of a craft or class of railway workers the power to represent the entire craft or class in all collective bargaining matters. While such a union is essentially a private organization, its power to represent and bind all members of a class or craft is derived solely from Congress. The Act contains no language which directs the manner in which the bargaining representative shall perform its duties. But it cannot be assumed that Congress meant to authorize the representative to act so as to ignore rights guaranteed by the Constitution. Otherwise the Act would bear the stigma of unconstitutionality under the Fifth Amendment in this respect. For that reason I am willing to read the statute as not permitting or allowing any action by the

bargaining representative in the exercise of its delegated powers which would in effect violate the constitutional rights of individuals.

If the Court's construction of the statute rests upon this basis, I agree. But I am not sure that such is the basis. Suffice it to say, however, that this constitutional issue cannot be lightly dismissed. The cloak of racism surrounding the actions of the Brotherhood in refusing membership to Negroes and in entering into and enforcing agreements discriminating against them, all under the guise of Congressional authority, still remains. No statutory interpretation can erase this ugly example of economic cruelty against colored citizens of the United States. Nothing can destroy the fact that the accident of birth has been used as the basis to abuse individual rights by an organization purporting to act in conformity with its Congressional mandate. Any attempt to interpret the Act must take that fact into account and must realize that the constitutionality of the statute in this respect depends upon the answer given.

The Constitution voices its disapproval whenever economic discrimination is applied under authority of law against any race, creed or color. A sound democracy cannot allow such discrimination to go unchallenged. Racism is far too virulent today to permit the slightest refusal, in the light of a Constitution that abhors it, to expose and condemn it wherever it appears in the course of a statutory interpretation.