Walter ALLEN et al.

v.

UNITED STATES.

No. 135–58.

United States Court of Claims.
June 3, 1959.

**359**

Bernard Susman, St. Louis, Mo., for plaintiffs.

Kathryn H. Baldwin, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

PER CURIAM.

This suit is brought by, or on behalf of the estates of 47 persons, herein referred to as the plaintiffs, who at some time between June 22, 1933, and October 15, 1956, worked as trainmen on the Missouri Pacific Railroad. During that period the railroad was operated by trustees appointed by, and under the supervision and control of, the District Court of the United States for the Eastern District of Missouri. The reason for the trusteeship under judicial supervision was that the railroad was going through the process of reorganization of it capital structure pursuant to the provisions of section 77 of Chapter VIII of the Bankruptcy Act, 47 Stat. 1474, 11 U.S. C. § 205.

The plaintiffs were Negroes. During their employment with the railroad they were known as "train-porters" which was a classification applied exclusively to Negroes. As "train-porters" they assisted passengers with their baggage, and performed other tasks. But in addition to those tasks, they performed all of the functions of "brakemen" on passenger trains. They were not, however, paid the wages which white men who worked as brakemen on passenger trains were paid.

During World War I, while the railroads were administered by the Government through the agency of a Director General of Railroads, men who did the kind of work which the plaintiffs did were classified as brakemen, or porter-brakemen, and received brakemen's pay. The railroads were returned to private management in 1921, and then the Missouri Pacific and the Brotherhood of Railroad Trainmen, a union which admitted no Negro members, entered into an agreement whereunder Negroes would not be employed as brakemen, and white men would not be employed as "train-porters" on passenger runs. Thereafter the plaintiffs worked as train-porters, and as such received less pay than brakemen. This practice continued from 1921 until the railroad went into the trusteeship in 1933, and continued through the trusteeship until 1956, when the railroad was returned to the direct management of its owners. So far as we are advised, the practice still continues.

The plaintiffs allege that the practice of paying Negro brakemen less than white brakemen, and of requiring Negro brakemen to perform porters' duties in addition to brakemen's duties, was "unjust and discriminatory." That much would seem to be obvious. They further say that the practice was violative of the plaintiffs' constitutional and statutory rights. In this proceeding they are suing the United States for the additional wages which, they say, they earned but

were not paid because of the discriminatory practice.

The plaintiffs cannot recover. When a sovereign sets up courts for the adjudication of the rights of its citizens, it makes available to its citizens an essential and useful service. It does not thereby undertake to right all wrongs out of the public treasury. It may well be that the alleged discriminatory practice of the railroad while it was in private management between 1921 and 1933 was, if it occurred, a violation of law. See Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173. If so, the "train-porters" had the same access to the courts that the complainant had in Steele. During the period covered by the instant suit, the Missouri Pacific was operated by trustees appointed by and under the supervision of a District Court of the United States. If the alleged discriminatory practice was illegal, it would seem that a complaint could have been made to the court, which could have required the trustees to operate the railroad in all respects in conformity with the law. So far as appears, no such complaint had been made. If complaint had been made and the District Court had failed to properly protect the legal rights of the plaintiffs, appellate relief would have been available.

Instead of asserting their alleged rights in tribunals made available to them by the Government for that purpose, they sue the Government for money compensation for their asserted wrongs. They seek to stretch the doctrine of such cases as Shelley v. Kraemer, 334 U. S. 1, 68 S.Ct. 836, 92 L.Ed. 1161, to make it fit their situation. The doctrine of those cases is that the States and the Federal Government, through their judicial branches, will not become *particeps* to a racial discrimination, by judicially enforcing a discriminatory agreement between private persons. We have no such situation here. The United States did not own the railroad, nor employ the plaintiffs. It merely made available to a railroad in financial distress a judicial proceeding which might lead to a rational reorganization. Because of the court's supervisory powers, relief from illegal employment practices would seem to have been more easily available than in the normal situation. But the court did not become a policeman on a beat, charged with the duty of detecting violations of which no complaint was made. The United States did not, through its judicial branch, enforce a discriminatory practice against the plaintiffs. And if there had been, which there was not, any error or neglect of duty on the part of the court, the United States would not have become liable to compensate the victim of that error.

The plaintiffs' petition will be dismissed.

It is so ordered.