## Gaskell v. Crucible Steel Company of America

Before O'Toole, Soffel and Thompson, JJ.

*Albert B. De Salardi* and *Drayton Heard*, for plaintiff.

*Charles E. Kenworthey* and *Reed, Smith, Shaw & McClay*, for defendant.

THOMPSON, J., September 7, 1950.—At the conclusion of the taking of testimony both plaintiff and defendant made motions for binding instructions to the jury. Plaintiff's motion was denied and defendant's motion was affirmed and a verdict was accordingly, by direction of the court, entered for defendant.

Plaintiff was employed at the Park works of the Crucible Steel Company of America in Pittsburgh as a 25-ton no. 1 craneman for a period prior to January 4, 1944, and from that date to October 12, 1945, when he voluntarily left defendant's employ. He was paid in full the amount of his wages in accordance with his oral contract. In his statement of claim plaintiff sued to recover the sum of $504.80, with interest. The statement of claim is quite brief and the material parts setting forth the basis of plaintiff's cause of action are found in paragraphs 4 and 5, which are as follows:

"4. During the period from January 4, 1944, to October 12, 1945, plaintiff was employed at defendant's Park works in said Allegheny County as a 25 ton no. 1 craneman in defendant's sheet mill, and was paid $.905 per hour under an oral contract of employment.

"5. By virtue of elimination of wage rate inequities ordered adjusted by sections X-3, XI and XIII of the directive order of the National War Labor Board of November 25, 1944, there became lawfully due and owing to plaintiff an increase of $.155 per hour whereof 73.22 percent was lawfully due and owing to plaintiff for at least 4,448 hours worked from January 4, 1944, until October 12, 1945, or the sum of $504.80."

The directive order of the National War Labor Board, referred to in paragraph 5, was not made a part of the statement of claim, nor was any other document.

A voluminous answer was filed on the part of defendant containing new matter in which it was denied that the sections of the directive order of the National War

Labor Board of November 25, 1944, contained any provisions or directions to defendant to pay plaintiff any increase in compensation, and it was denied that any sum of money was due and owing to plaintiff.

In the new matter, forming a part of the answer, a history was given of the wartime labor negotiations in the course of which a directive order was issued by the National War Labor Board on November 25, 1944, and of the negotiations and agreements, which took place following this directive order between defendant, Crucible Steel Company of America, and the United Steelworkers of America, Congress of Industrial Organizations, as bargaining agent for its employes. The various documents, which defendant contended form the basis of any obligations by it to any of its employes, were set forth as follows:

The directive order to which reference has already been made;

A pamphlet containing a printed agreement between the Crucible Steel Company of America and the United Steelworkers of America (CIO), dated April 30, 1947;

A copy of agreement amending section 10 (Retroactive Payments), article IV (Rates of Pay) of the April 30, 1947, agreement, which amended agreement was executed by the parties on February 4, 1948.

### Question at Issue

Where an employer entered into an agreement with the duly authorized collective bargaining agent of its employes for a new standard wage scale, which also provided for certain lump-sum retroactive payments to employes who were on the payroll at the time the agreement took effect and to such former employes who within 120 days thereafter filed individually signed requests in writing for the same, and the employer has fully performed his part of the agreement by paying into a pool the entire sum of money, which he would have been required to pay had all former employes

qualified, and this sum of money was distributed among the persons who had qualified under the agreement, can a former employe, who was unaware of the retroactive lump-sum payment and did not file a written application for same within 120 days, recover against the employer for the amount he would have received if he had qualified?

In connection with the testimony of plaintiff, his counsel offered in evidence exhibit 1, which is the directive order of the National War Labor Board dated November 25, 1944, and sought to establish by oral testimony the basis of plaintiff's claim for additional compensation. Plaintiff then later offered in evidence exhibit 2, which is the agreement between the Crucible Steel Company of America and the United Steelworkers of America (CIO), dated March 30, 1945.

Harry J. Bream, works controller of the Crucible Steel Company of America, called by plaintiff, was asked:

"Q. What was the retroactive pay rate fixed for a 25-ton no. 1 craneman on the work, working at the crucible?

Mr. Kenworthey: "Objected to, unless he offers exhibit No. 3, which is the basis for this question."

The trial judge having indicated that the written documents were the best evidence of the facts which plaintiff sought to prove, counsel for plaintiff offered in evidence exhibit 3, which is dated April 30, 1947. Mr. Heard stated:

"Then plaintiff reluctantly offers in evidence exhibit no. 3, being agreement between the Crucible Steel Company and the United Steel Workers of America (CIO) with the reservation that there is no admission there that this quoted position on page 18, namely, 'said lump sum payment shall be in full settlement of all claims under Section 6-C, Article IV of the March 30, 1945 agreement for the period of January 4, 1944 to March

31, 1947 inclusive.' We say we do not admit all of that quoted position was asserted in plaintiff's claim for retroactive pay."

During the time plaintiff was employed at the Park works of the Crucible Steel Company of America and thereafter, the United Steelworkers of America (CIO) were the duly authorized and exclusive bargaining agent for defendant's employes, who were its production and maintenance workers, and plaintiff was a member of the union.

In the latter part of the year 1943 labor disputes arose between the United Steelworkers of America (CIO) and the major basic steel producers of the United States, including defendant company. As a result of these labor disputes, there was a temporary stoppage of work and the disputes were then referred to the National War Labor Board, an advisory body made up of public, labor and employer members. After protracted hearings and extensive testimony, the National War Labor Board on November 25, 1944, issued what is called its "Directive Order" and which has been offered in evidence as exhibit 1 in this case. In this directive order certain of the claims of the United Steelworkers of America (CIO) were approved, some were rejected, others were modified and some left for future investigation and negotiations. The portions of the directive order, which relate to the present controversy, are set forth in exhibit 1, subheading "3. Wage Rate Inequities", which in part reads as follows:

"(a) The union requests Board approval of a principle, stated as 'equal pay for similar work throughout the industry,' to be used as a guide in collective bargaining for the elimination of wage rate inequities. This request of the union is denied because the phrase has been so variously interpreted by the parties that it would not be a useful guide and because, if interpreted to mean industry-wide equalization of all wage

rates, the principle would be contrary to the terms of Executive Order 9328 and the May 12 supplement of the Director of Economic Stablization.

"(b) The problem of adjusting inequitable intra-plant wage rate relationships in this industry is one of long standing. Previous contracts with many of the companies provided machinery to adjust such wage rate inequities. In some contracts, a joint management-union commission was agreed upon to develop a procedure for that purpose. Those commissions failed to find the answer to the problem, largely because of lack of agreement upon the extent to which the adjustment of intra-plant inequities should affect payrolls.

"The National War Labor Board now has the task of specifying guideposts to facilitate collective bargaining directed to the solution of that long standing problem.

"(c) The company and the union shall negotiate the elimination of existing intra-plant wage rate inequities and reduction in the number of job classifications in accordance with the following steps: . . .

"(d) (2) The maximum increase for any one company shall not exceed an amount equivalent to an average of five cents per hour for all its employees covered by this directive order.

"(3) *The wage rate adjustments which may be made are to be solely for the purpose of eliminating intra-plant wage rate inequities. They cannot be general across-the-board wage increases, and any such general increases will be disapproved.* . . .

"Effective Date . . .

"The adjustments ordered in Secs. IV, VII, X and XI of this order shall be computed and applied retroactively in accordance with the provisions of the order of Dec. 27, 1943. The Board recommends that the parties negotiate with a view to settling the amount of retro-

active pay due to employees in the form of individual lump sum payments." (Italics supplied.)

The directive order of the National War Labor Board to which reference has been made above was, as we construe it, a command to the employers of the basic steel industries and the United Steelworkers of America (CIO) to negotiate along certain lines, but did not of itself create any definite obligations to pay any specific sums of money to the members of the labor union involved. The directive contemplated, as we view it, subsequent negotiations between the employers and the union. Both the employers and the union seem to have so construed the directive.

On March 30, 1945, the Crucible Steel Company of America and the United Steelworkers of America (CIO), entered into a comprehensive printed agreement, which is in evidence as exhibit 2. On pages 20 and 21 of this agreement there is set out the portion thereof, which bears on our present controversy, as follows:

"C. Wage Rate Inequities.

(a) The Company and the Union shall negotiate the elimination of existing intra-plant wage rate inequities and reduction in the number of job classifications in accordance with Section X-3, XI and XIII of the Directive Order of the National War Labor Board of November 25, 1944, which by reference are incorporated herein (attached hereto as an appendix).

(b) Any adjustments that may be made pursuant to the aforesaid Section X-3 and XI of the Directive shall be effective as of January 4, 1944; provided that the effective date and the cost incident to any wage adjustments made pursuant to the Resolution of the National War Labor Board, dated December 13, 1944, dealing with the processing of pending alleged wage rate inequities, shall be in accordance with the provisions of said Resolution."

It will be observed that the March 30, 1945, agreement set out as exhibit 2, does not finally determine the question of "existing intra-plant wage rate inequities and reduction in the number of job classifications", but merely serves to initiate negotiations regarding these rather intricate matters.

The negotiations between the United Steelworkers of America (CIO) and the Carnegie-Illinois Steel Corporation seem to have been completed prior to the negotiations with the other basic steel corporations and to have furnished a pattern for the contracts, which defendant and other basic steel corporations finally made with the union. This contract between the Carnegie-Illinois Steel Corporation and the United Steelworkers of America (CIO) was offered in evidence as exhibit 8 and is dated May 8, 1946. On page 81 it contains the following statement:

"(d) As promptly as practicable, after the date on which the plant standard hourly wage scales become officially established the Company will calculate and disburse the retroactive payments as follows, thereby satisfying all rights of any employees of the Company in respect of intra-plant wage inequities from January 4, 1944. . . ."

Continuing, on page 82:

"(3) The foregoing payments shall be made to all employees who worked during the period January 4, 1944 to the date on which the plant standard hourly wage scales are officially established, *except that employees who quit or were discharged prior to the latter date shall receive such foregoing payments only if request is filed in writing by the individual employee with the Company within 120 days from such date.*" (Itallics supplied.)

The last named agreement was amended on January 13, 1947, and the amendment is incorporated with the

original agreement, exhibit 7, which was offered. On page 107 there is the following statement:

"Therefore, Section 4(d) of the May 8, 1946 agreement is changed to read as follows:

"(d) As promptly as practicable after the date on which the plant standard hourly wage scales become officially established the company will calculate and disburse individual lump sum payments to qualified individuals as defined in paragraph (3) as follows: . . ."

Continuing, on page 110:

"(6) *The parties hereto agree that the disbursement of the individual lump sum payments as above provided shall be a final settlement of obligations of the Company with respect to retroactive pay to employees and former employees under this or any prior agreement between the Company and the Union relating to wage rate inequities.*" (Italics supplied.)

The above agreement between the Carnegie-Illinois Steel Corporation and the United Steelworkers of America (CIO) was, according to the evidence in this case, submitted to the Steel Commission, which was the successor of the National War Labor Board, for approval, and was approved by the latter body.

Following the agreement made by the union with the Carnegie-Illinois Steel Corporation, a substantially similar agreement was made by the same union with defendant, the Crucible Steel Company of America, dated April 30, 1947. This is the agreement, which is offered in evidence as exhibit 3 and which, as we view this controversy, is, with its amendment, the important document in this case. The agreement, exhibit 3, after making provision for retroactive wage scale payments, on page 20 contains the following:

"e. The foregoing lump sum payments shall be made to employees who are on the Works payroll *and to former employees who are not on the payroll provided such former employees file individually signed requests*

*therefor in writing with the Company within one hundred and twenty (120) days after the installation of the plant standard wage scale.*

*"2. The parties hereto agree that the disbursement of the individual lump-sum payments as above provided shall be a final settlement of obligations of the Company with respect to retroactive pay to employees and former employees under this or any prior agreement between the Company and the Union relating to wage rate inequities."* (Italics supplied.)

Plaintiff was not in the employ of defendant steel company on April 30, 1947, when the contract set forth as exhibit 3 was made, nor on the later date, June 29, 1947, when the new plant standard wage scale was installed at the Park works. Plaintiff did not apply for his retroactive pay within 120 days following June 29, 1947.

The agreement between the employer and the labor union did not provide for the giving of any notice to former employes, and plaintiff contends that he had no notice of the making of the agreement, exhibit 3. It does appear, however, that he knew negotiations were in progress. In the course of his cross-examination he stated:

"Mr. Kenworthey:

"Q. Mr. Gaskell, do you want us to understand the first you heard about any negotiations between the union and the company in regard to retroactive pay was in December of 1948?

"A. Yes.

"Q. You never read in any newspapers or heard from other quarters about it in 1944?

"A. It was taken up but I didn't know how soon—

"Q. Was there conversation about it at the plant also in 1945?

"A. Yes.

"Q. There was a conversation about it, wasn't there?

"A. Yes.

"Q. So you had heard about negotiations before December 1948; is that right?

"A. Yes."

The Crucible Steel Company of America paid into a pool the entire sum of money, which it would have been required to pay had retroactive lump-sum payments been made to all of its employes, who were working during the period from January 4, 1944, to the expiration date of the retroactive payments, and this pool was distributed among the persons, who became entitled to participate under the agreement.

It would, therefore, appear that the insertion in the agreement of the 120-day period during which former employes were required to make written application was not in the interest of the Crucible Steel Company of America, defendant, but rather in the interest of the United Steelworkers of America (CIO), who represented and were the bargaining agent for plaintiff.

## I.

The United Steelworkers of America (CIO) were the duly qualified representative of plaintiff and all other employes of the Crucible Steel Company of America in the negotiations of wage scales and wage controversies, and they continued to be the representative of plaintiff after his employment with defendant had terminated and until all matters growing out of such employment had been adjusted. We do not believe that there is any difference of opinion as to the above statement.

## II.

The rights of plaintiff, we think, if any exist at the present time, depend upon the contract of April 30, 1947, between the Crucible Steel Company of America and the United Steel Workers of America (CIO).

The directive order issued by the National War Labor Board on November 25, 1944, and the subsequent agreement to negotiate made by the Crucible Steel Company of America and the United Steelworkers of America (CIO), dated March 30, 1945, it seems to us, are preliminary to and to some extent explanatory of the final agreement, which was entered into on April 30, 1947, between the Crucible Steel Company of America and the United Steelworkers of America (CIO). This is the agreement, which has been referred to as exhibit 3.

In making this agreement plaintiff was represented by the authorized labor union, the United Steelworkers of America (CIO), and he is bound by the contract which his representative made. If he regards it as a contract, which was improvident insofar as he was concerned, that is a matter about which the courts are not now permitted to inquire.

### III.

Plaintiff not being an employe of defendant company at the time the contract, exhibit 3, was executed, to wit, April 30, 1947, could not have a vested right in any retroactive pay even though it reached back over part of the period during which he was employed, and cannot be heard to complain because former employes were permitted under conditions to share in this retroactive pay.

In their initial briefs neither plaintiff nor the defendant were able to cite any appellate court case, which dealt with the 120-day provision contained in the contract under discussion. We were referred, however, to a number of lower court decisions in jurisdictions other than Pennsylvania, which seem to support defendant's contention, and there was one United States district court case, Zagaiski v. Carboloy Co., Inc., 88 F. Supp. 162, where a retroactive pay agree-

ment applied only to employes on the active payroll and where one of the employes, who entered military service, sought to recover. The court held that only employes on the payroll at the time the agreement was made were entitled to recover.

The strongest authority bearing on the question at issue is a very recent one, to wit, Miller v. Johnstown Traction Company, 167 Pa. Superior Ct. 421, decided by the Superior Court of Pennsylvania on July 20, 1950. This case involved the right to recover a retroactive increase, which had been made by arbitrators pursuant to a collective bargaining agreement made between defendant, Johnstown Traction Company, and the labor union of which plaintiff was a member, after plaintiff had terminated his employment with defendant. The arbitration was carried out in accordance with a contract between the employer and the labor union. The court said at page 427:

"Appellant is suing upon the contract and is bound by its provisions, including the stipulations for its modification. He is suing for the increased wages provided by one change in the contract and denying the validity of the change made at the same time concerning retroactivity of the new wage scale. He was bound by the terms providing for an arbitration, and by the results of the arbitration. He cannot assert that the union acting as his agent could, agreeably to the contract providing for changes, accept the decision of arbitrators changing the rates of wages and deny his agent's authority to agree to the condition upon which the wages were increased. 'If he (the principal) would have the benefit of the bargain, he must adopt it as his agent made it': Keough v. Leslie, 92 Pa. 424, 427. 'The plaintiff is seeking to enforce the contract made by its agent, . . . and even if as a matter of fact that agent exceeded his authority, yet if the plaintiff company seeks to take the benefit of the bargain so made, it must

adopt the contract as its agent made it'. . . . Appellant's right to the increased wages would have vested on August 25, 1948, had he remained in the company's employ—and not before. His right to share retroactively in increased wages was a mere expectancy; it depended upon the continuation of existing circumstances; that is, upon the continuing operation of the original contract without alteration by the parties. See 11 Am. Jur. Constitutional Law §370."

Plaintiff seeks to escape from the logic of the above reasoning by contending that the wage agreement made by the United Steelworkers of America (CIO) with the Crucible Company of America, exhibit 3, was discriminatory against former employes and therefore illegal. In support of this contention plaintiff cites and relies very strongly on Steele v. Louisville & Nashville Railroad Co. et al., 323 U. S. 192. Plaintiff in that case was a Negro and was a locomotive fireman in the employ of defendant company and sued on his own behalf and that of his fellow employes, who like petitioner were firemen employed by the railroad. The majority of the firemen employed by the railroad were white and members of the Brotherhood of Locomotive Firemen and Enginemen, but a substantial minority were Negroes, who by the constitution and ritual of the brotherhood were excluded from its membership. The court said at page 194:

"As the membership of the Brotherhood constitutes a majority of all firemen employed on respondent Railroad, and as under §2, Fourth the members because they are the majority have the right to choose and have chosen the Brotherhood to represent the craft, petitioner and other Negro firemen on the road have been required to accept the Brotherhood as their representative for the purposes of the Act. . . .

"On February 18, 1941, the railroads and the Brotherhood, as representative of the craft, entered into a

new agreement which provided that not more than 50%
of the firemen in each class of service in each seniority
district of a carrier should be Negroes; that until such
percentage should be reached all new runs and all
vacancies should be filled by white men; and that the
agreement did not sanction the employment of Negroes
in any seniority district in which they were not work-
ing. . . .

"The Supreme Court of Alabama took jurisdiction of
the cause but held on the merits that petitioner's com-
plaint stated no cause of action. It pointed out that
the Act places a mandatory duty on the Railroad to
treat with the Brotherhood as the exclusive represen-
tative of the employees in a craft, imposes heavy crim-
inal penalties for willful failure to comply with its
command, and provides that the majority of any craft
shall have the right to determine who shall be the rep-
resentative of the class for collective bargaining with
the employer, see Virginian R. Co. v. System Federa-
tion, 300 U. S. 515, 545. . . .

"But we think that Congress, in enacting the Rail-
way Labor Act and authorizing a labor union, chosen
by a majority of a craft, to represent the craft, did not
intend to confer plenary power upon the union to sacri-
fice, for the benefit of its members, rights of the minor-
ity of the craft, without imposing on it any duty to pro-
tect the minority. Since petitioner and the other Negro
members of the craft are not members of the Brother-
hood or eligible for membership, the authority to act
for them is derived not from their action or consent
but wholly from the command of the Act. . . .

"The labor organization chosen to be the representa-
tive of the craft or class of employees is thus chosen to
represent all of its members, regardless of their union
affiliations or want of them. . . .

"Unless the labor union representing a craft owes
some duty to represent non-union members of the

craft, at least to the extent of not *discriminating* against them as such in the contracts which it makes as their representative, the minority would be left with no means of protecting their interests or, indeed, their right to earn a livelihood by pursuing the occupation in which they are employed. . . .

"We think that the Railway Labor Act imposes upon the statutory representative of a craft at least as exacting a duty to protect equally the interests of the members of the craft as the Constitution imposes upon a legislature to give equal protection to the interests of those for whom it legislates. Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents, cf. J. I. Case Co. v. Labor Board, supra, 335, but it has also imposed on the representative a corresponding duty. . . .

*"This does not mean that the statutory representative of a craft is barred from making contracts which may have unfavorable effects on some of the members of the craft represented.* Variations in the terms of the contract based on differences relevant to the authorized purposes of the contract in conditions to which they are to be applied, such as differences in seniority, the type of work performed, the competence and skill with which it is performed, are within the scope of the bargaining representation of a craft, all of whose members are not identical in their interest or merit. (Cases cited.) Without attempting to mark the allowable limits of differences in the terms of contracts based on differences of conditions to which they apply, it is enough for present purposes to say that the statutory power to represent a craft and to make contracts as to wages, hours and working conditions does not include the authority to make among members of the craft discriminations not based on such relevant differences.

*Here the discriminations based on race alone are obviously irrelevant and invidious. Congress plainly did not undertake to authorize the bargaining representative to make such discriminations.* (Cases cited) . . . It is the federal statute which condemns as unlawful the Brotherhood's conduct." (Italics supplied.)

Certainly no one can find fault or disagree with anything said by the late Chief Justice Stone in Steele v. Louisville & Nashville Railroad Company.

It seems to us, however, that that case does not support the position now taken by plaintiff. The contract made in that case by the railroad and the labor union not only violated a Federal statute, but probably violated the Federal Constitution and particularly the fourteenth and the other Civil War amendments.

Defendant argues that there is a difference between employes, who were working at the time the agreement was made and former employes, which justified some modification of their positions and treatment both from the standpoint of the employer, who was trying to keep the plant in operation, and the standpoint of the labor union. Plaintiff at the time exhibit 3 was executed had other employment and was no longer a member of the CIO but of the American Federation of Labor. There was nothing in the contract now before us which violated either an act of Congress or the Federal Constitution.

We are of the opinion that the ruling of the trial judge, which resulted in binding instructions to the jury in favor of defendant, was correct and, therefore, plaintiff's motion of May 19, 1950, for judgment non obstante veredicto will be refused.

### Order of Court

And now, to wit, September 7, 1950, the motion for judgment non obstante veredicto is refused and it is ordered that judgment be entered upon payment of verdict fee.