Harry **FARKAS** et al., Plaintiffs,

v.

NEW YORK NEWSPAPER PRINTING PRESSMEN'S UNION NUMBER 2, an unincorporated association of 7 or more members having a President and Secretary-Treasurer, the New York Times Company and News Syndicate Co., Inc., Defendants.

No. 67 Civ. 46.

United States District Court, S. D. New York.

April 24, 1970.

Elliot W. Isaacson, New York City, for plaintiffs.

Harold & Barbaro, by John R. Harold, New York City, for defendant Local # 2.

Townley, Updike, Carter & Rodgers, New York City, for New York Times Co. and News Syndicate Co., Inc.; by Andrew L. Hughes and John D. Canoni, New York City, of counsel.

## DECISION AND OPINION

POLLACK, District Judge.

This is a representative class suit for a declaratory judgment brought by plaintiffs on their own behalf and on behalf of all journeymen pressmen [1] similarly affected, against their Union, the defendant, New York Newspaper Printing Pressmens Union No. 2. Also joined as defendants are two newspaper publishers, the defendants, New York Times Co. and News Syndicate Co., Inc. who publish newspapers within the Union's territorial jurisdiction and who are parties to a collective bargaining agreement with the Union. The plaintiffs have expressly stated that they do not seek any affirmative relief against the newspaper publishers. They were named merely to apprise them of the results of this lawsuit.

Jurisdiction over the subject matter of this suit exists under Section 301(a) of the Labor Management Relations Act (29 U.S.C.A. § 185(a)).

The plaintiffs charge that on or about June 16, 1965, without any vote by the Union's membership, the defendant Union undertook to promulgate an order freezing all seniority [2] of its members employed by the defendant newspapers including that of these plaintiffs.

Thereafter, on Sept. 18, 1966, the Union lifted the freeze for a period of thirty (30) days within which former employees of closed newspapers might obtain employment, free of the freeze order, with the defendant newspapers.

The plaintiffs charge that their seniority rights were thereby affected by "arbitrary and discriminatory" acts which "invade[s] the plaintiff's contract and property rights flowing from the pre-existing collective bargaining agreement of June 1, 1965". Such a claim is tantamount to asserting that the Union

---

1. Since the commencement of this action, plaintiffs Charles Atkinson, Francis Butler and Donald Ryan have left their employment under the jurisdiction of the defendant Union.

2. Although the terms "seniority" and "priority" may have separate meanings in other circumstances it has been agreed by the parties that the terms are synonymous and may be used interchangeably for the purpose of the facts here presented.

has breached its duty of fair representation and that the breach violates the collective bargaining agreement. However, the plaintiffs have clearly stated that the action is not upon the collective bargaining agreement as such, but upon the allegedly wrongful acts of the Union first, in promulgating the freeze order and thereafter, fixing the thirty (30) day interval free of the freeze order, mentioned above and thus superseding the seniority and priority attained by these plaintiffs through employment by the defendant newspapers by some of them for more than a year prior to the limited lifting of the freeze.

The facts of this case were largely stipulated and showed the following:

The Union is and has been a labor union chartered by the International Printing Pressmen and Assistants Union of North America.

The Union is the collective bargaining agent for its members, and has territorial jurisdiction, among other places, throughout the City of New York.

The collective bargaining agreement between the defendant Union and the Publishers Association of New York City, (which was the representative of the remaining two defendants) was effective March 31, 1965 and expired March 30, 1967. At the time of the execution of this collective bargaining agreement, there were in existence and under territorial jurisdiction of the defendant Union, three other newspapers, known respectively as Herald Tribune, World Telegram and Sun, and Journal American, the publishers of which were all parties to and bound by the same collective bargaining agreement.

The local Union Constitution provides as follows:

## ARTICLE II

### Form of Organization
### Senior and Auxiliary Branches

Sec. 1. This local shall be composed of journeymen newspaper printing pressmen of every description, embracing those employed in the production of daily newspapers, comic and magazine sections of newspapers, pictorial rotogravure sections of newspapers and those who are or who may be employed in the production of any other part or section of newspapers, which are produced or may be produced by any special process not mentioned herein. The members employed at work, as described above, shall constitute the senior branch of this local.

Sec. 2. This local shall maintain an auxiliary composed of all apprentices and junior pressmen who do not qualify for journeymen membership in the senior branch. The auxiliary shall in all respects be subordinate to and under the direction of the senior branch of the organization.

Juniors, apprentices or "boys" (all hereinafter referred to as juniors) are advanced to the status of journeymen in order of their priority of employment on a City-wide basis. Priority among those who have attained journeymen status is determined on a shop [3] basis with each newspaper maintaining separate priority lists. If, on any given day, the journeyman with the first priority in shop (newspaper) # 1 were to transfer to shop (newspaper) # 2, he would be placed in last priority among the journeymen in shop # 2 but ahead of all of the juniors in shop # 2.

On June 16, 1965, the then acting president of the defendant Union caused to be distributed to the shop chairmen and members of the Union a notice and directive reading as follows:

Please be advised that contingent on the rumors that became public last evening on a national broadcasting company news program of the alleged merger of the Herald Tribune, World Telegram and Sun, and the Journal American, all lines and jobs are frozen under the jurisdiction of Union Local No. 2 until some plans have been developed and definite and specific com-

---

3. Each newspaper constitutes a separate shop.

mitments have been proposed by the publishers.[4]

The majority of Executive Committee Members recommend that a moratorium be declared in relation to the elevation of Juniors to the status of Journeymen.

Prior to the distribution of this notice and directive, no vote on the subject matter was taken by the Union membership.

Subsequent to the distribution of the directive of June 16, 1965 the newspapers known as Herald Tribune, World Telegram and Sun, and Journal American, continued to publish and continued to retain in their employ, members of the Union until approximately April 24, 1966 when each of these papers stopped publishing. Eventually these papers were merged into a single newspaper known as World Journal Tribune, which continued to employ many, but not all, of the employees of the former newspapers merged therein. This new World Journal Tribune commenced publication on September 12, 1966, approximately four months after the cessation of publication by the three merged papers and approximately sixteen months after the freeze order of June 16, 1965.

On June 27, 1965, at a regular monthly meeting, the union membership voted to lift the moratorium with respect to the elevation of juniors to journeymen status and to elevate six juniors to the status of journeymen, two in June and two in July and two in August if no further developments arose to preclude their advancement.[5] Three of the plaintiffs herein were among the six elevated during June, July and August, 1965.[6] In accordance with subsequent membership votes, the remainder of the present plaintiffs were advanced from junior to jour-

neyman status during the pendency of the freeze.[7] Therefore, although the moratorium was lifted with respect to elevating juniors to journeymen status, the seniority freeze continued.

On September 13, 1965, the Executive Committee met and recommended to the membership that "the freeze of shop lines be lifted as of November 1st if no further developments arise." However, at the regular monthly meeting of the Union membership held on December 19, 1965, a motion to table this recommendation was called for and carried.

The minutes of the Executive Committee meeting of June 6, 1966 record the following:

The Executive Committee reports that upon resumption of publication of the merged papers, the target date for the members affected shall be 30 days from the date of resumption of publication and further recommends the "freeze" be lifted from the table.

On September 18, 1966, the Union membership, for the first time, voted to adopt this report of the Executive Committee with negative votes noted on behalf of the plaintiffs Farkas, Donovan, Mehling, Luzzi and Atkinson.

During this "target period" those men who were employed by the closed papers but who were not employed by the new merged paper were permitted to transfer to an ongoing paper. But for the freeze, each would have attained priority in the order in which he signed up with his chosen new paper beneath all who were journeymen on that paper. The effect of the freeze was that where two or more journeymen of a particular closed paper moved over to an ongoing paper during the target period, each would retain in respect of each other

4. The effect of this directive was to "freeze" each man in his current job with his current priority standing.

5. A vote of the membership is required by the Union Constitution (Art. III, § 4) to elevate juniors to journeymen. As there are no membership meetings held in July and August, votes on elevations to

take place in July and August are usually taken in June.

6. June 27, 1965—Harry Farkas, Thomas Brown.
July 6, 1965—Francis Butler

7. e. g., Dec. 19, 1965—George Wiseman, Robert O'Rourke

the same priority in the new shop as they each enjoyed in the old shop, regardless of the date on which each arrived at the new employment. Naturally, those journeymen who moved over would come behind all of the journeymen previously employed at the new shop. For example, journeymen A and B were employed by shop 1 with journeyman A in first priority and journeyman B in last priority. After shop 1 closed and on the first day of the target period, journeyman B went to shop 2, an ongoing paper. He would assume the position of the last journeyman in shop 2. If on the last day of the target period, journeyman A were to transfer to shop 2, he would enjoy the status of the next to last journeyman on shop 2, just above journeyman B.

Plaintiffs were juniors as of the date the freeze was instituted. They were not permitted to establish priority during the freeze period over those employees who had attained journeyman status prior to the freeze. At the end of the target period, all of the plaintffs enjoyed priority beneath all who were journeymen prior to the freeze period.

Therefore, in granting journeyman status to plaintiffs during the freeze, the Union membership created a special or hybrid class of employees, i. e., journeymen without priority.

The Union, following the action of the membership of September 18, 1966, from time to time, furnished to the other defendants lists of journeymen, arranged in the order of priority, dictated by the Union. Pursuant thereto, more than 47 former employees of the merged newspapers acquired employment with the defendants prior to October 12, 1966, (thirty days after the resumption of publication of the merged paper) and within the previous thirty day "target" period, and have been accorded priority over plaintiffs herein in their respective employments with the defendant newspapers. The priority standing of these plaintiffs in the shops of the defendants, New York Times Company and of News Syndicate Co., Inc. has, respectively, been moved down accordingly.[8]

Under the Union laws, practice, and custom the choice of whether to work a day or night shift, and the choice of time within which vacations may be taken, the choice of working days and regular days off, are all in accordance with the order of priority. Priority also determines the number of times an employee may be relegated to "shape up".[9] The amount of paid vacation is determined by the number of days worked in a prior year; consequently, a man who loses working days because he is subject to "shape up" will obtain a shorter paid vacation.

Priority also determines the opportunity to work overtime and advancement.

The collective bargaining agreement between the Union and the Publishers Association, the representative of the defendant newspapers, states in pertinent part:

    \* \* \* The Union shall supply and maintain in each office priority lists of journeymen arranged in the sequence of tenure of employment, provided that employees shall have priority rating in not more than one office.[10]

---

8. E. g.: When plaintiff Farkas was advanced to journeyman on June 27, 1965, he had been employed in the pressroom of the New York Times for the previous ten years; he continued to work for the Times during the freeze and remained in their employ since that time. Because his status was "frozen" throughout the freeze period, journeymen from the merged papers who went to work for the Times after June 27, 1965 but before the freeze period ended were given priority over him. Thus, although he was permitted to become a journeyman during the freeze, his priority remained beneath all who were journeymen prior to the freeze.

9. A practice whereby the man or men with lowest priorities must show up each day (or night) for work, and are sent home if there is insufficient work.

10. This provision appears in the collective bargaining agreement under the section entitled "foreman's Duty and Authority".

Plaintiffs contend that they were not granted priority "in the sequence of tenure of employment" because they were not permitted to establish priority during the freeze. They might also argue that the effect of the freeze was to give those who attained journeyman status prior to the freeze, priority over them in more than one shop. Each journeyman had priority over plaintiffs on whichever paper he chose to work during the target period.

Although not presented by plaintiffs, the argument might be made that the freeze was an "alteration" or "amendment" within the meaning of the Union Constitution which provides as follows:

Sec. 7. During the duration of a contract its terms and provisions may be altered or amended during that period only by the consent of a majority assembled at a regular or special meeting, upon the recommendations of a majority assembled at a regular or special meeting, upon the recommendation of a majority of the contract committee who negotiated such contract, and after proper notice of such proposal had been posted in every chapel at least one (1) week prior to the meeting.[11]

It was stipulated herein that each plaintiff, on behalf of himself and of all other members of the Union similarly situated, duly exhausted all of his available appeals and remedies within the Union and within the International, as provided by their respective constitutions, in respect of the matters set forth herein.

█ This Court holds that plaintiffs were not "journeymen" within the meaning of the collective bargaining agreement. Although in the throes of a crisis situation, the Union membership voted to grant plaintiffs the benefits of journeyman status on the condition that they accept these benefits without the right to establish priority over those men who were already journeymen. At the time of their elevation to journeymen, each

of the plaintiffs realized that he would not be able to establish priority until the expiration of the freeze. Mr. William Kennedy, the current president of the local Union, in response to several questions addressed by the Court, testified as follows:

MR. KENNEDY: There was a rumor that the Telegram, the Tribune and the Journal were going to merge to one paper so the acting president froze all the lines and declared a moratorium. We were not going to make any more journeymen. * * *

Then we come to the meeting in June. [When the first plaintiffs were elevated] We voted to give two juniors a journeyman card, and there was no misunderstanding to anybody in that room. They were not going to be able to establish priorities until the people from these other three papers were situated because if there was any doubt they would not have gotten journeymen cards until the whole thing was cleared up. * * *

They got elevated with a string on it.

The local Union Constitution requires a membership vote for elevation. There was no obligation on the part of the membership to elevate them and conversely, no obligation on the plaintiffs' part to accept this promotion. If the condition attached was too onerous, plaintiffs' remedy was to refuse the hybrid status and to remain juniors until the termination of the freeze. Nothing in the Union Constitution or in the collective bargaining agreement precluded the Union membership from attaching this condition to the elevation of members of the subordinate auxiliary under its direction[12] (juniors) during a crisis situation.

Plaintiffs have failed to prove that the Union breached the duty of fair representation owed to them.

Plaintiffs claim to priority is based solely on the collective bargaining agree-

---

11. Article XIX, Union Constitution, p. 39.

12. From the Union Constitution, quoted supra, at p. 163.

ment. Absent a provision guaranteeing priority to plaintiffs in the agreement, they are not entitled to it. Therefore, the Union has no duty to accede to plaintiffs' contention. However, it may be argued that the creation by the Union membership of this hybrid status for plaintiffs constituted a breach of the duty of fair representation.

It is now well established that, as the exclusive bargaining representative of the employees * * * the Union had a statutory duty fairly to represent all of those employees, both in its collective bargaining with Swift [the employer], see Ford Motor Co. v. Huffman, 345 U.S. 330 [73 S.Ct. 681, 97 L. Ed. 1048]; Syres v. Oil Workers International Union, 350 U.S. 892 [76 S. Ct. 152, 100 L.Ed. 785], and in its enforcement of the resulting collective bargaining agreement, see Humphrey v. Moore, 375 U.S. 335 [84 S.Ct. 363, 11 L.Ed.2d 370]. The statutory duty of fair representation was developed over 20 years ago in a series of cases involving alleged racial discrimination by unions certified as exclusive bargaining representatives under the Railway Labor Act, see Steele v. Louisville & N. R. Co., 323 U.S. 192 [65 S. Ct. 226, 89 L.Ed. 173]; Tunstall v. Brotherhood of Locomotive Firemen, 323 U.S. 210 [65 S.Ct. 235, 89 L.Ed. 187], and was soon extended to unions certified under the N.L.R.A., see Ford Motor Co. v. Huffman, supra. Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct. Humphrey v. Moore, 375 U.S., at 342 [84 S.Ct., at 367].

Vaca v. Sipes, 386 U.S. 171 at 177, 87 S.Ct. 903 at 909, 17 L.Ed.2d 842 (1967).

The freeze order of the Union quashed potentially serious adverse effects on the printing industry which might otherwise have resulted from the rumors of the closing of newspapers. The existing priority system placed a high premium on an early departure by a journeyman from a closing shop so that he might establish priority elsewhere ahead of his fellow workers. This could have the effect of forcing the closure of a paper that otherwise would have continued publishing. The necessity for quick action on the part of the Union in these circumstances is clear. In the case at bar, the freeze may have prolonged the existence of the closing papers, and therefore provided more working hours for Union members. Moreover, the target period provided an orderly and fair system of assigning new priorities at the ongoing papers. There was evidence at trial that the Union had instituted freezes in the past. The action to elevate plaintiffs was gratuitous and exemplary on the part of the Union. The "freezing" of plaintiffs in their priority as juniors was not unreasonable or arbitrary. The effect of the freeze on the plaintiffs was not discriminatory. As was the case with all journeymen, plaintiffs' priority was frozen at the time of the institution of the freeze. The subsequent action of granting to plaintiffs the other benefits of journeymen did not affect this freeze. As journeymen from any paper could have established priority over plaintiffs at its inception, the burden of the freeze did not fall more heavily upon the shoulders of the plaintiffs. In fact, this resolution seems to be the fairest possible under the circumstances.

■ Therefore, the action of the Union in freezing the priority of members was consistent with custom, usage and prior practice of the Union and its membership and was reasonable under the circumstances. Such action was neither arbitrary nor discriminatory against the plaintiffs.

Accordingly, the action by plaintiffs should be and is dismissed on the merits, and judgment should be entered for the defendants, without costs

The foregoing shall constitute the findings required by Rule 52(a) Fed.R.Civ. P.

So ordered.