**LOCAL UNION NO. 90 OF the AMER-ICAN FLINT GLASS WORKERS' UNION OF NORTH AMERICA**

v.

**AMERICAN FLINT GLASS WORKERS' UNION OF NORTH AMERICA, A.F.L.-C.I.O., et al.**

**Civ. No. 70-1347-HM.**

United States District Court,
D. Maryland.
April 25, 1974.

Jerome F. Connell, Sr., Lloyd E. Clinton, Jr., Glen Burnie, Md., and Gerald E. Topper, Baltimore, Md., for plaintiff.

Francis D. Murnaghan, Jr., Baltimore, Md., for defendants Carr-Lowrey Glass Co., Glass Containers Corp., and Maryland Glass Corp.

Donald N. Rothman, Baltimore, Md., and Richard M. Colasurd, Toledo, Ohio, for defendants American Flint Glass Workers' Union of North America, A.F. L.–C.I.O.

MURRAY, District Judge.

## I. *The Facts*

Plaintiff Local Union 90 ("the Local") is affiliated with defendant American Flint Glass Workers' Union (AFGWU, or "the International"), and represents employees of the other three defendants ("the Companies"). The dispute centers around the interpretation of the contract negotiated between the AFGWU and the Companies, and applicable between 1968 and 1971. Trial was held on the plaintiffs' claims but defendants' counterclaims are pending.

The Baltimore area mold-makers were, prior to 1968, paid on a different scale from similar workers elsewhere. Base pay here was lower, but the disparities were rectified through the payment of "skill adjustments," which were based on the worker's years of experience. With the adjustments, Baltimore wages were in rough parity with nationwide scales.

One issue in the 1968 contract negotiations was the equalization of base pay throughout the country. The content and effect of the resulting contract are subject to dispute. The defendants argue that it abolished the "skill adjustments" in the Baltimore area. The plaintiffs argue that a clause (Article 28.1) preserving "all written local agreements that are presently recognized by a manufacturer and a local union" applies to the "skill adjustment" agreements. On that basis, they claim an additional 20¢ per hour. Defendants claim that these were "supplemental" agreements, and that "local agreements" covered working conditions only.

Defendants also assert that the plaintiffs have not exhausted the grievance procedures established by the contract, thus barring resort to this Court. It is this contention on which attention will be focused.

Article 25 of the contract sets out the grievance procedures:

### PRESENTATION OF GRIEVANCES

1. If a representative of management fails to give his answer within the time limits specified in any step of the grievance procedure, the griev-

ance may be processed to the next step of the grievance procedure within the time limits set forth in such step.

If an employee has a grievance, he shall, within three working days from the date the grievance arises, proceed as follows:

Step 1. Present it to his foreman, with or without a shop committeeman as the employee may choose, for discussion and settlement. The foreman shall give the employee his decision on the grievance within one working day after it has been presented to him.

Step 2. If the grievance is not settled in Step 1, the employee shall, within three working days after receiving his foreman's decision on his grievance, reduce such grievance to writing, sign it and refer it to the shop committee and his foreman for discussion and settlement. The foreman shall give the shop committee his decision on the grievance in writing within three working days after it has been presented to him.

Step 3. If the grievance is not settled in Step 2, the shop committee shall, within three working days after receiving the foreman's written decision on the grievance, refer the matter to the plant superintendent or his designated representative for discussion and settlement. Any records that are not considered confidential will, if they have any bearing on the grievance, be supplied by either party for review. The plant superintendent or his designated representative shall give the shop committee his decision in writing on the grievance within three working days after it has been presented to him.

Step 4. If the grievance is not settled in Step 3, the shop committee shall, within five working days after receiving the decision of the plant superintendent or his designated representative, refer the grievance to the International President of the Union or his designated representative and the proper officials of the Manufac-

turer, in conjunction with the Director of Labor Relations of the Institute or his designated representative, for discussion and settlement.

The proceedings set forth in this Step shall be considered terminated fifteen days after the date on which the shop committee refers the grievance to the aforementioned parties unless extended by mutual agreement.

Step 5. If the grievance is not settled in Step 4, it shall, at the request of either the International President of the Union or the Director of Labor Relations of the Institute, be submitted to a five-man Joint Conciliation Committee, and a majority decision of such Committee shall be final and binding on all parties. In such event, the party desiring to submit the dispute to the Joint Conciliation Committee must so notify the other party in writing within ten days after the termination of the proceedings set forth in Step 4, which notice shall set forth the matter to be settled. The Joint Conciliation Committee shall consist of the International President of the Union or his designated representative, the Director of Labor Relations of the Institute or his designated representative, one additional representative to be appointed by each of them within five days after notice is received that the grievance is to be taken to such Committee, and a chairman to be selected by these four members. Should these four members be unable to agree upon a chairman within five additional days, the Federal Mediation and Conciliation Service shall be asked to appoint the chairman through its established rules of procedure. The Joint Conciliation Committee shall have no power to add to, subtract from, or modify any of the provisions of this contract.

2. Each party shall pay one-half of the fees and expenses of the chairman of the Joint Conciliation Committee.

3. This grievance procedure shall not be invoked by the Manufacturers

or the Union to change premium payments which were negotiated and agreed to locally by any Manufacturer and a Local Union prior to the effective date of this contract.

The parties have stipulated that the Local never filed what could be chracterized as a grievance under this procedure. Donald Owings testified that he and George Beach, then President of the Local, complained verbally to a foreman at the Maryland Glass Corporation and had a meeting with the "labor relations man" on the matter, at which the corporation rejected the Local's contention that the "skill adjustments" should be paid. This meeting took place toward the end of August, 1968.

At a later point, counsel for the Local sent two letters to the Maryland Glass Corporation, but in each instance the response of the corporation was that the Local had not met the procedural requirements of Article 25. (Plaintiff's Exhibits 15; Defendant Companies' Exhibits 9, 10, 11 and 12.)

There was also testimony about communications between Mr. Beach and George Parker, President of the International. The first such communication was a telephone call placed on the same day as the meeting with the labor relations man at the Maryland Glass Corporation (testimony of Donald Owings). Next, on September 21, 1968, Mr. Beach sent a letter to Mr. Parker setting out the basis of the Local's demand for an additional twenty cents an hour (Plaintiff's Exhibit 3). Mr. Parker responded with a letter on October 7, 1968, stating that the Local has "no cause for a grievance" (Plaintiff's Exhibit 4A). In late July 1970, Mr. Parker received a copy of the second company response to the Local's counsel (Plaintiff's Exhibit 15). The International President then wrote William Fontz, the corresponding secretary of the Local, seeking elucidation (Plaintiff's Exhibit 16), which he received by letter from Mr. Fontz (Plaintiff's Exhibit 11). Mr. Parker then on August 7, 1970 reiterated his conclusion that the Local had "no cause for a grievance" (Plaintiff's Exhibit 12).

Two other pieces of evidence are relevant here, for reasons that will emerge later. The first is a letter dated September 25, 1968, from J. Thomas Rimer to Mr. Parker (Plaintiff's Exhibit 4B). At that time, Mr. Rimer was the Director of Labor Relations for the Glass Container Manufacturers Institute (the collective bargaining agent for some of the Companies). The letter was a discussion of the status of any supplemental agreements under the newly signed contract. Although it does not specifically mention the Local 90 agreement, its conclusion is that no such agreements remained in force under the new contract.

The second piece of evidence is the description by two witnesses of a meeting at the 1971 International Convention. The meeting took place in a room off the convention floor, and was attended by, among others, Mr. Parker, Richard Colasurd (counsel for the International), and Benjamin Cort (an International officer who had participated in the negotiation of the 1968 contract and who had explained it to a meeting of Local 90 during the ratification process). The witnesses who took part in the meeting were John Ochlech and Mr. Fontz. Both testified that Mr. Parker took them aside to urge them to drop the present suit; according to Mr. Fontz, Mr. Cort added that he might have erred in not bringing up the Baltimore supplemental agreement at the contract negotiations. Again according only to Mr. Fontz, Mr. Cort went on to say that he would testify that he had "negotiated out" all the supplements.

## II. *The Law and its Application Here*

In weighing these facts, the following propositions of law are applicable.

The fundamental decisions concerning whether an employee must exhaust his contractual grievance remedies are, of course, Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967)

and Glover v. St. Louis-San Francisco Rwy. Co., 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969). *Vaca* enunciated the general rule[1] that a union member may not ordinarily resort to the courts for resolution of an employment-related grievance before exhausting remedial procedures prescribed by the collective bargaining agreement, and then set out two principal exceptions to this rule. An employee may go to court when the employer's conduct estops him from relying on the defense of non-exhaustion, *Vaca, supra,* 386 U.S. at 185, 87 S.Ct. 903, but that situation is not presented here.

We think that another situation when the employee may seek judicial enforcement of his contractual rights arises if, as is true here, the union has sole power under the contract to invoke the higher stages of the grievance procedure, *and* if, as is alleged here, the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's *wrongful* refusal to process the grievance. It is true that the employer in such a situation may have done nothing to prevent exhaustion of the exclusive contractual remedies to which he agreed in the collective bargaining agreement. But the employer has committed a wrongful discharge in breach of that agreement, a breach which could be remedied through the grievance process to the employee-plaintiff's benefit were it not for the union's breach of its statutory duty of fair representation to the employee. To leave the employee remediless in such circumstances would, in our opinion, be a great injustice. We cannot believe that Congress, in conferring upon employers and unions the power to establish exclusive grievance procedures, intended to confer upon unions such unlimited discretion to deprive injured employees of all remedies for breach of contract. . . .

For these reasons, we think the wrongfully discharged employee may bring an action against his employer in the face of a defense based upon the failure to exhaust contractual remedies, provided the employee can prove that the union as bargaining agent breached its duty of fair representation in its handling of the employee's grievance. [Footnote omitted.]

*Vaca,* 386 U.S. at 185–186, 87 S.Ct. at 914. When a member does not meet this second exception, *Vaca* makes clear that a union decision not to press a grievance will not be reexamined in court, even if the member has done all he can on his own.

*Glover* set out what was termed a third exception to the *Vaca* rule. The case was a suit by employees alleging a racially discriminatory collusion between the employer and the union. The defendants argued that the plaintiffs had not exhausted their contractual remedies; Justice Black met the argument by saying:

The circumstances of the present case call into play another of the most obvious exceptions to the exhaustion rquirement—the situation where the effort to proceed formally with contractual or administrative remedies would be wholly futile. In a line of cases beginning with Steele v. Louisville & Nashville R. Co., supra [323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944)], the Court has rejected the contention that employees alleging racial discrimination should be required to submit their controversy to "a group which is in large part chosen by the [defendants] against whom their real complaint is made." 323 U.S., at 206 [65 S.Ct. at 234]. And the reasons which prompted the Court to hold as it did about the inadequacy of a remedy before the Adjustment Board apply with equal force to any remedy

---

1. The rule had been stated before, see Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965), but

Vaca set out both the rationale of the rule and exceptions to it.

administered by the union, by the company, or both, to pass on claims by the very employees whose rights they have been charged with neglecting and betraying. Here the complaint alleges in the clearest possible terms that a formal effort to pursue contractual or administrative remedies would be absolutely futile.

393 U.S. at 330–331, 89 S.Ct. at 551.

The relationship between the second exception in *Vaca* and the exception set up by *Glover* has not been clear. Both exceptions arise where the union has violated its duty of fair representation, so that the need for the *Glover* exception has been obscure. Courts have made varying observations concerning the meaning of *Glover*.

In Smith v. Pittsburgh Gage and Supply Co., 464 F.2d 870 (3rd Cir. 1972), the Court stated:

[W]hen resort to arbitration would be futile, the employees need not exhaust the arbitration procedures before seeking relief in the courts. Accord, Derr v. Bright, 297 F.Supp. 12 (M.D. Pa.1969).

464 F.2d at 875. The facts of *Smith*, as well as of Derr v. Bright,[2] make clear that the courts in those cases felt that "futility" applied, and the exhaustion requirement did not, whenever the employee was unlikely for any reason to prevail. See also Seay v. McDonnell Douglas Corp., 427 F.2d 996 (9th Cir. 1970); cf. Rothlein v. Armour & Co., 391 F.2d 574 (3rd Cir. 1968); Bieski v. Eastern Automobile Forwarding Co., 396 F.2d 32 (3rd Cir. 1968), where the courts held that "unreasonable" arbitration procedures did not have to be deferred to.

Other courts, less expansive in reading *Glover*, have held that the case's holding is restricted to suits alleging *racial* discrimination. Fulsom v. United-Buckingham Freight Lines, Inc., 324 F. Supp. 135 (W.D.Mo.1970); Bowen v. Lockheed-Georgia Co., 309 F.Supp. 1210, at 1215 (N.D.Ga.1970).

Still others have relied on the fact that the plaintiffs in *Glover* had on previous occasions petitioned the union for help, to no avail, making clear the futility of further attempts. Retana v. Apartment, Motel, Hotel and Elevator Operators Union, Local 14, 453 F.2d 1018, at 1027 (9th Cir. 1972); Waters v. Wisconsin Steel Works of International Harvester, 427 F.2d 476, at 489–490 (7th Cir. 1970). Closely related to this view is the interpretation that the *Glover* exception arose from the fact that the employer and the union were charged with a pattern of collusion and conspiracy breaching the union's duty of fair representation; the collusion was the gravamen of the complaint and would have been the gravamen of any grievance. It would clearly be futile to expect the contractual remedies administered by the employer and the union to be responsive to such a claim. See Orphan v. Furnco Construction Corp., 466 F.2d 795, at 803 (7th Cir. 1972).

The difference between these two views is of limited significance, especially in the instant case. Further, while the Fourth Circuit has not had occasion to consider the precise meaning of *Glover*, it has indicated that it would concur in some formulation similar to the ones in *Waters* or *Orphan*:

Where an employee member of a union bases his case upon a conspiracy or an illegal combination between his union and his employer to deprive him of his rights he cannot be forced to submit that issue to arbitration be-

---

2. In Smith, the employees had "filed a grievance with the union and attempted to use the arbitration provisions of the . . . contract without success." 464 F.2d at 875. The employer "freely admitted" that its position was uncompromisingly in opposition to plaintiffs'; the Court held that either Glover's exception or Vaca's had been sufficiently met to permit a jury finding for the plaintiffs.

In Derr v. Bright, the employee-plaintiff alleged that the union "acquiesced in the employer's wrongful action" and "did nothing to assist [another, similar grievant] in his attempt to rectify the situation."

tween the employer and the union since such procedure would entrust representation of the complaining employee to the very union which he claims refused him fair representation and because it would present as adversaries in the arbitration proceeding the two parties charged by the employee with combining to defraud him.

Lusk v. Eastern Products Corp., 427 F. 2d 705, at 708 (4th Cir. 1970). See also Sensabaugh v. Railway Express Agency, Inc., 348 F.Supp. 1398 (W.D.Va.1972).

In this view, the second exception set out in *Vaca* deals with the case where the union's unfair representation occurred first in the failure to process the grievance from which the suit arises, the grievance is with the employer alone, and there could have been no way of telling that the grievance would not be fairly treated until it was submitted.

Even in the absence of an indication that the Fourth Circuit will follow *Waters* or *Orphan*, this Court would find the approach of those cases more persuasive than the Third Circuit approach in Smith v. Pittsburgh Gage and Supply Co., *supra*. The more expansive rule of *Smith* appears to undercut the policies behind the *Vaca* exhaustion requirement, allowing an employee-union member to resort to the courts whenever he has obtained from a union official an expression that his grievance would not be pressed. Since the Supreme Court in *Glover* explicitly and approvingly referred to *Vaca*, the expansive interpretation of *Smith* seems unjustified.

On the other hand, the restriction of *Glover* to suits alleging racial discrimination seems unduly narrow. It is true that the facts of the case support such a construction, but the language of the passage already quoted seems to require a somewhat larger view. Justice Black refers to "a line of cases beginning with Steele v. Louisville & Nashville R. Co.," but in describing the "circumstances of the present case" expands them beyond the racial aspects to "the situation where the effort to proceed formally with contractual or administrative remedies would be wholly futile." *Glover, supra*, 393 U.S. at 330–331, 89 S.Ct. at 551.

In order to preserve both the expansion of *Glover* beyond its facts and its restriction within the bounds of *Vaca*, the approach suggested above seems the most acceptable.

The distinction is of importance to this case because plaintiffs have argued that their failure to exhaust contractual remedies is justified on the grounds of futility. If this Court were to accept the reading of *Glover* taken in *Smith*, the plaintiffs in this case would have excellent grounds for arguing that exhaustion of contractual remedies would have been futile and unnecessary.

■ However, under the formulation of *Glover* which the Court is disposed to adopt, the plaintiffs would, in order to come within the exception, have had to allege that the International's role in the origin of the grievance amounted to a violation of the duty of fair representation, or that on other occasions the International behaved unfairly. No such allegation has been made.[3]

■ Consequently, the plaintiffs can only justify the failure to exhaust contractual remedies by showing that the International breached its duty of representation in the handling of the grievance itself. The Court finds as a fact that the International did not display bad faith in concluding that the Local had no grievance.

It would be barely possible to argue that the letter from Mr. Rimer shows collusion between the employers and the International, since it preceded and might arguably have influenced Mr.

3. The Court is aware that it has a duty to interpret pleadings liberally where a charge of unfair representation may have been made. Czosek v. O'Mara, 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970). However, both the pleadings and the trial reveal absolutely no attempt by plaintiffs to make such accusations against the International.

Parker's conclusion in his letter to the Local that no grievance was presented. Plaintiffs have not explicitly made this assertion, although they did offer the letter in evidence. No other evidence was offered that substantiated any suggestion of collusion. This Court feels that Mr. Parker reached his conclusion on the basis of his memory and understanding of the contract and negotiations. That the employers' representative reached the same conclusion merely illustrates the validity of Mr. Parker's judgment.

It might also be argued that the statements of Mr. Cort at the 1971 Convention show ill will to the Local, and, by inference, bad faith in handling the grievance. Again, plaintiffs have not explicitly so argued, and the Court concludes that Mr. Cort's remarks do not in fact support the inference of bad faith. No evidence was offered to connect these remarks—made after the institution of this suit—to Mr. Parker's motives in handling the grievance.

A comparison of this case with Griffin v. International Union, United Auto Workers, 469 F.2d 181 (4th Cir. 1972) demonstrates how far this evidence is from substantiating a claim of bad faith. There, Judge Sobeloff ruled that a jury was justified in finding for the plaintiff, a union member who had been discharged from his job for brawling with a superior. Judge Sobeloff stressed three factors in holding the verdict permissible: first, that the unions had insisted on filing the grievance with the very man with whom the plaintiff had been accused of brawling; second that a vote by the membership to press the grievance had been disregarded; and third, that the union officer who handled the grievance was a good friend of the same company man. Similar factors are not in evidence here.[4]

■■ With regard to the exhaustion issue, plaintiffs have made the added argument that the grievance procedure was inappropriate for this dispute. It is true that since all the dispute settlement procedures are contractual, they must be resorted to only if the parties intended that they be used for the particular type of dispute. There are two factors which would seem to dictate a finding here that the parties did intend to submit claims like this one to the grievance machinery. First, there was testimony by Mr. Ochlech, on cross-examination, that previous disputes over wages had been submitted to Article 25 procedures, once at least in 1964, and perhaps at other times. Second, Article 25 refers only to "grievances" without defining the word; Subsection 3 excluded from the procedures disputes over "premium pay", a category not involved here. The law is clear that ambiguity of this variety is to be resolved in favor of requiring submission to grievance procedures. See United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574 at 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); John Wiley and Sons v. Livingston, 376 U.S. 543, 84 S. Ct. 909, at 915, 916–917, 11 L.Ed.2d 898 (1964); Local Union 24, International Brotherhood of Electrical Workers v. Hearst Corp., 352 F.2d 957 (4th Cir. 1965). The Court finds that this issue was appropriate for the contractual grievance procedures.

■■ By finding that the grievance could have been submitted to contractually prescribed mechanisms, and that the International did not breach its duty

4. Quoting language in Vaca to the effect that "the Union might well have breached its duty had it ignored [the grievant's] complaint or had it processed the grievance in a perfunctory manner. . . . ", Vaca, supra, 38 U.S. at 194, 87 S.Ct. at 919, the First Circuit has held that mere perfunctoriness is evidence of arbitrary treatment of a grievance. De Arroyo v. Sindicato de Trabajadores Packinghouse, AFL–CIO, 425 F.2d 281 (1st Cir. 1970). The holding has been cited with approval in the Third and Fifth Circuits. Smith, supra, 464 F.2d at 875; Turner v. Air Transport Dispatchers' Association, 468 F.2d 297 (5th Cir. 1972). Assuming that these cases are correct in their reading of Vaca, it is clear that the International gave more than "perfunctory" attention to the Local's grievance. See Turner, 468 F.2d at 300.

of fair representation, the Court is precluded by the Supreme Court's holding in *Vaca* from examining the *reasonableness* of the International's decision not to press the grievance. In this regard, it is worth pointing out that, while *Vaca* has been criticized for unnecessarily restricting the rights of union members,[5] the reasoning behind that restriction is peculiarly forceful in this case. Justice White described the policy, in relevant part as follows:

> [B]oth sides are assured that similar complaints will be treated consistently, and major problem areas in the interpretation of the collective bargaining contract can be isolated and perhaps resolved. And finally, the settlement process furthers the interest of the union as statutory agent and as coauthor of the bargaining agreement in representing the employees in the enforcement of that agreement. See Cox, Rights Under a Labor Agreement, 69 Harv.L.Rev. 601 (1959).
>
> If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery . . . would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation.

*Vaca, supra*, 386 U.S. at 191, 87 S.Ct. at 917.

The issue in this case is integrally related to the International's negotiating strategy; it would be destructive of the labor policy to allow a Local Union to second-guess the nationwide bargaining agent. In the absence of the special circumstances set out in *Glover* and *Vaca*, the International's judgment will not be reviewed by this Court.

For the foregoing reasons, it is this 25th day of April, 1974,

Ordered that plaintiff's Complaint be, and the same hereby is, dismissed.

5. See, e. g., Note, Individual Control Over Personal Grievances Under Vaca v. Sipes, 77 Yale L.J. 559 (1968); Blumrosen, Workers'

Rights Against Employers and Unions, 24 Rutgers L.Rev. 480 (1970).